# Exhibit 7

49D05-1809-PL-037971
Marion Superior Court, Civil Division 5

Filed: 9/21/2018 4:25 PM
Myla A. Eldridge
Clerk
Marion County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | )SS: | |
| COUNTY OF MARION | ) | CAUSE NO.: _____ |

| | |
|---|---|
| DENISON, INC. and | ) |
| DENISON PARKING, INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| CARL E. MOST & SON, INC. | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT AND JURY DEMAND

For their complaint and jury demand against Carl E. Most & Son, Inc. ("Most"), Plaintiffs Denison, Inc. and Denison Parking, Inc. (collectively, "Denison") show the Court as follows:

### PARTIES

1. Denison Inc. is an Indiana corporation with its principal place of business in Indianapolis, Indiana.

2. Denison Parking, Inc. is an Indiana corporation with its principal place of business in Indianapolis, Indiana.

3. On information and belief, Most is an Indiana corporation with its principal place of business in Indianapolis, Indiana.

4. The Court has subject matter jurisdiction over the matter.

5. The Court has personal jurisdiction over Most by virtue of the fact that it is an Indiana corporation and the events leading to this lawsuit occurred in Indianapolis, Indiana.

6. Venue is proper in this county pursuant to Ind. Trial Rule 75.

## FACTS APPLICABLE TO ALL CLAIMS

7. Among other things, Denison owns and operates parking garages in Indianapolis and elsewhere.

8. One such parking garage is located at 109 South Capital Avenue in Indianapolis and is known as the Plaza Garage.

9. The Plaza Garage is a multi-level facility with floors constructed out of reinforced concrete.

10. For many years beginning in the mid-1990s, Denison retained Most's expert services to inspect its parking facilities, including the Plaza Garage, and analyze what repairs and maintenance were needed at those facilities.

11. Most held itself out to Denison as an expert in the inspection, repair, and maintenance of parking facilities and reinforced concrete.

12. In particular, Denison relied on the expertise and guidance of Most's president and principal officer (the "Principal") in retaining Most's services.

13. Denison retained Most and the Principal to provide expert services regarding the inspection, repair, and maintenance of reinforced concrete in light of Most's representations about the expertise of Most and its Principal.

14. Based on these representations, Denison relied on Most for inspections, maintenance, and repairs of the reinforced concrete at its parking facilities, including at the Plaza Garage.

15. Throughout the period it retained Most, Denison relied on Most and its Principal to identify problems with the reinforced concrete in its garages, including the Plaza Garage.

16. Most regularly inspected each of Denison's parking facilities in Indianapolis, including the Plaza Garage.

17. Most had sole responsibility for those inspections.

18. These inspections included an annual inspection in the latter part of each year to determine what repairs were needed on each garage and to prepare a list of maintenance items for the coming year.

19. After these inspections, Most prepared annual reports detailing repairs, maintenance, and other work to be completed at the Plaza Garage and elsewhere.

20. These reports were prepared and submitted by the Principal.

21. Most made recommendations as to which of these issues were priorities to address.

22. Denison relied on Most and the Principal in how to maintain the reinforced concrete at the Plaza Garage, what parts of the Plaza Garage needed repairs, and how those repairs were to be completed.

23. After Most recommended work, Denison would authorize it to proceed based on recommendations made by Most and its Principal.

24. Denison relied on recommendations by Most and its Principal as to the timing, manner, and scope of work needed at the Plaza Garage.

25. Once Denison approved recommendations made by Most and its Principal, Most was responsible for repairing the reinforced concrete at the Plaza Garage and for ensuring the quality of the repairs on concrete at the Plaza Garage.

26. Most and its Principal were aware that Denison relied on their expertise.

27. When the repairs required Most to replace or otherwise remove concrete from garages, Most would often schedule the repairs for late night hours both to minimize customer disruption and also create an environment where only Most employees would be at the garages.

28. While Denison occasionally hired others to perform simple tasks such as painting parking lines or putting up signs, Most alone was responsible for inspecting, maintaining, and repairing concrete within the Indianapolis garages, including the Plaza Garage.

29. Most and its Principal were responsible for designing, planning, supervising, and observing construction of these improvements to Denison's Plaza Garage.

30. Most submitted invoices to Denison for compensation for its expert services as well as for repair work at the Plaza Garage.

31. Based on these invoices, Denison paid Most millions of dollars for its services, including for concrete repair work at the Plaza Garage.

32. Denison and Most's arrangement was a contract in which Most provided expert services through its Principal and performed work on the concrete at the Plaza Garage. In turn, Denison paid Most at agreed upon sums.

33. Each time Most worked on concrete at the Plaza Garage, Most represented to Denison that it had properly repaired and reinstalled the concrete.

34. Testing through chain dragging is a non-destructive way to identify delaminated concrete.

35. Tests (including chain dragging performed in September of 2016) revealed that some of the concrete flooring on the ramp between the first and second floors of the Plaza Garage was delaminated, meaning it had split into layers.

36. Embedded in the concrete are long tensile strands known as "Post-Tensioning Tendons."

37. These Post-Tensioning Tendons reinforce the concrete in Denison's garages, including the Plaza Garage.

38. The Post-Tensioning Tendons must be properly installed and put under tension to ensure that the concrete floors can safely hold the weight of the numerous automobiles that park in the Plaza Garage.

39. In the fall of 2016, Denison's engineer examined an area where the concrete had become delaminated and spalled. This included by removing the upper layer of the concrete to reveal the contents below it.

40. When Denison's engineer removed the upper layer of concrete in the delaminated area in 2016, it revealed defects in the manner in which Most maintained and installed the Post-Tensioning Tendons and other materials under the top layer of the concrete.

41. These defects previously were concealed by the concrete repair materials installed by Most.

42. Because the defects in the Post-Tensioning Tendons were concealed by concrete, Denison only learned of them until the concrete was removed in the fall of 2016.

43. Because the defects in the Post-Tensioning Tendons were concealed by concrete, Denison could not know of these defects until the concrete was removed in the fall of 2016.

44. Denison immediately sealed off the damaged area, losing income from parking spaces in that area.

45. Denison learned of a second area of defective performance in the summer of 2017.

46. Denison again sealed off this area and again lost income from parking spaces in that area.

47. After discovering these two areas of defects in the garage, Denison engaged its engineer to determine the extent of Most's defective performance.

48. This process has disclosed that similar hidden defects exist elsewhere throughout the Plaza Garage.

49. The defects Denison has discovered in Most's work include, but are not limited to:

   a. Post-Tensioning Tendons with sheathing damage and corrosion of the Post-Tensioning Tendon strands beneath;

   b. Post-Tensioning Tendons that had become corroded;

   c. Post-Tensioning Tendons that had been cut or sliced;

   d. Removal of Post-Tensioning Tendons in areas of concrete patch repairs;

   e. Feathering of concrete patches in violation of industry standards;

   f. Improper sealing of replacement covering on Post-Tensioning Tendons that allowed moisture to seep in and damage the Post-Tensioning Tendons;

   g. The use of nails to hold down Post-Tensioning Tendons, which is not standard industry practice as it damages the sheathing for the Post-Tensioning Tendons and allows water penetration and corrosion of the Post-Tensioning Tendons.

   h. The use of tape on the Post-Tensioning Tendons, improperly repairing and/or covering the sheathing; and

        i.      Improper use of epoxy below the membrane covering the concrete in amounts far exceeding the accepted and appropriate use of epoxy.

50. The use of the epoxy on some levels of the garage made detection of defects more difficult, as it conceals defects that might otherwise be discovered through chain dragging and other means of testing the concrete.

51. On information and belief, Most performed similar defective work on other floors throughout the Plaza Garage.

52. These and other failures to properly maintain and repair the concrete, the Post-Tensioning Tendons, and other aspects of the Plaza Garage have required Denison to incur expenses to repair the defects created by Most and its Principal.

53. The concrete is in this defective condition because of the actions of Most and its Principal, including Most's negligent and reckless behavior in carrying out its work for Denison.

54. After performing its defective work, Most covered the defects by reinstalling the concrete and, in some areas, applying excessive and inappropriate amounts of epoxy beneath the membrane.

55. The defects in Most's work were not readily visible, open, or obvious.

56. Denison could not have discovered the defects in Most's work until the concrete began cracking, delaminating, and showing other signs of its underlying defective condition.

57. While Most continued to work for Denison, Denison had no reason to mistrust Most's work or conduct its own testing.

58. Once covered by concrete and a membrane on the concrete, Most's defective work was not open, readily visible, or apparent.

59. Although Denison relied on Most and its Principal's expertise to locate areas in its garages that needed repairs, Most never informed Denison of the defects in the Plaza Garage.

60. Most's conduct damaged Denison, including but not limited to the fact that Denison paid Most for defective work, that Denison must pay to repair Most's defective work, and that Denison has and will lose income by losing the ability to rent parking spaces during the time repairs are made.

61. Denison's damages exceed at least $17 million.

62. Denison will continue to be damaged by Most's misconduct to the extent it locates additional defects within the Plaza Garage.

## COUNT I – BREACH OF CONTRACT

63. Denison incorporates Paragraphs 1 through 62 as if fully stated herein.

64. Denison and Most maintained a valid and enforceable contract.

65. Denison has fulfilled all obligations under that contract and satisfied all conditions precedent.

66. Most breached the contract by performing work that left the Plaza Garage in a defective condition.

67. Most's breach of the contract damaged Denison.

68. Denison has incurred direct and consequential damages as a result of that breach.

## COUNT II – UNJUST ENRICHMENT

69. Denison incorporates Paragraphs 1 through 68 as if fully stated herein.

70. In the alternative to Denison's contract claim, Denison asserts that it is entitled to recover the invoices it paid to Most for its defective work at the Plaza Garage.

71. Most sought a benefit from Denison by submitting invoices for payment.

72. Denison conferred a benefit to Most by paying those invoices.

73. It would be unjust for Most to retain that benefit in light of the defective work that Most performed that damaged the Plaza Garage and cost Denison the ability to rent parking spaces while time repairs were made to fix Most's work.

### COUNT III – NEGLIGENCE

74. Denison incorporates Paragraphs 1 through 73 as if fully stated herein.

75. Most owed a duty of care to identify areas needing repair at the Plaza Garage and to see that they were properly repaired.

76. Most and its Principal were in the business of providing these professional services, including repair, maintenance, design, and construction work on the Plaza Garage.

77. Most maintained a confidential and fiduciary relationship with Denison.

78. Most breached its duty of care by performing defective work on the Plaza Garage, by covering up that work by re-applying concrete without fixing the defective work, by cutting or slicing Post-Tensioning Tendons, by misapplying epoxy below the membrane on the concrete, by making negligent misrepresentations and omissions about the work at the Plaza Garage, and by failing to inform Denison of the defective condition in which Most left the Plaza Garage.

79. Most's breach of duty has proximately and actually caused damage to Denison by virtue of the fact that Denison needs to repair the defective work it has discovered at the Plaza Garage.

### COUNT IV– CONSTRUCTIVE FRAUD

80. Denison incorporates Paragraphs 1 through 79 as if fully stated herein.

81. Most maintained a fiduciary and special relationship with Denison.

82. Most owed a duty to Denison to ensure that the reinforced concrete in the Plaza Garage was properly inspected, repaired, and maintained.

83. Most owed a duty to Denison to disclose defects in the Plaza Garage due to its fiduciary and special relationship with Denison.

84. These duties arose out of the fiduciary and/or special relationship between Most and Denison.

85. Most violated its duties, including by failing to properly inspect, maintain, and repair the reinforced concrete in the Plaza Garage, by making deceptive material misrepresentations of past or existing facts, and by remaining silent when it had a duty to speak.

86. These breaches include its representations and omissions about the quality of its work and its failure to inform Denison regarding the defective work at and condition of the Plaza Garage.

87. Denison relied on Most and Most's statements and omissions.

88. Denison was damaged by its reliance on Most and Most's statements and omissions.

89. Most gained an advantage over Denison by virtue of that fact that it received payment for its defective work.

WHEREFORE, Denison respectfully requests that the Court: (1) enter judgment in its favor and against Most; (2) award Denison its damages; (3) grant Denison its costs and attorney's fees incurred in this matter; (4) award Denison prejudgment interest; and (5) grant all other just and appropriate relief.

**JURY DEMAND**

Denison demands trial by jury for all claims so triable.

Respectfully submitted,

s/Mark J. Crandley
Mark J. Crandley, Atty. No. 22321-53
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
(317) 261-7924
Mark.Crandley@btlaw.com

*Attorney for Plaintiff Denison, Inc. and Denison Parking, Inc.*