UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| HARLEYSVILLE LAKE STATES INSURANCE COMPANY, | ) ) ) |
| *Plaintiff*, | ) ) |
| vs. | ) No. 1:22-cv-01822-JMS-CSW ) ) |
| CARL E. MOST & SON, INC., DENISON, INC., DENISON PARKING, INC., and INDIANA INSURANCE COMPANY, | ) ) ) ) |
| *Defendants*. | ) ) |

## <u>ORDER</u>

Defendant Carl E. Most & Son, Inc. ("<u>Most</u>") provided inspection, repair, and maintenance services to Defendants Denison, Inc. and Denison Parking, Inc. (collectively, "<u>Denison</u>") related to parking garages owned by Denison.  After a dispute arose regarding damage to a garage owned by Denison, Denison sued Most in Marion Superior Court ("<u>the Underlying Action</u>") and ultimately obtained a jury verdict in its favor, but only on one of its claims.  Plaintiff Harleysville Lake States Insurance Company ("<u>Harleysville</u>") and Defendant Indiana Insurance Company ("<u>Indiana Insurance</u>") (collectively, the "<u>Insurers</u>") were commercial general liability insurers of Most, who both defended Most in the Underlying Action pursuant to reservations of rights.

Shortly before the Underlying Action proceeded to trial, Harleysville initiated this declaratory judgment litigation against Most, Denison, and Indiana Insurance, regarding its duty to indemnify Most arising from the Underlying Action.  [<u>Filing No. 1</u>; <u>Filing No. 110</u>; <u>Filing No. 111</u>.]  Indiana Insurance filed a declaratory judgment counterclaim against Harleysville and crossclaims against Most and Denison seeking the same relief as Harleysville.  [<u>Filing No. 25</u>.] Denison filed counterclaims against Harleysville and crossclaims against Indiana Insurance also

1

seeking a declaratory judgment and alleging breach of contract.  [Filing No. 29; Filing No. 120.] Most filed a counterclaim against Harleysville for breach of contract.  [Filing No. 70.]

Pending before the Court are the following motions, all of which are ripe for the Court's consideration: Indiana Insurance's Motion for Summary Judgment, [Filing No. 130]; Harleysville's Motion for Summary Judgment, [Filing No. 131]; and Denison's Cross-Motion for Summary Judgment, [Filing No. 152], for which Most filed a Notice of Joinder, [Filing No. 159].

## I.
### EVIDENTIARY ISSUES

In their motions for summary judgment, the parties raised two evidentiary issues.  Because the Court's rulings on the evidentiary issues impacts the evidence the Court will consider on summary judgment, the Court discusses them first.

### A.        Harleysville's Objection

Harleysville objects to the admissibility of certain evidence presented by Denison in its brief in support of summary judgment.  [Filing No. 165 at 8-9.]  Specifically, in support of its response and Cross-Motion for Summary Judgment, Denison relies upon a jury investigation conducted by Indiana Insurance whereby the investigator interviewed the jurors and asked them how they reached their decision in the Underlying Action.  [Filing No. 153 at 10 (citing Filing No. 152-14 at 1).]  Denison highlights that in Indiana Insurance's investigator's notes, the investigator stated that "[t]he jurors [told the investigator] that '[t]hey were all in agreement that Most had done shoddy work, and that this work led to subsequent damage at the parking garage' including damaged and cut tendons and sheathing."  [Filing No. 153 at 10-11 (quoting Filing No. 152-14 at 1).]  Denison also relies upon another note from the investigator that, "[w]ith respect to their negligence verdict, [the jurors] stated that they had found in Most's favor because Most's shoddy work was not the sole cause of the property damage to the garage; rather, they believed that

Denison was also 'negligent in not spending enough money to keep the garage in the best condition.'" [Filing No. 153 at 11 (quoting Filing No. 152-14 at 1).] Denison thereafter argued that, based on the jurors' statements that the verdict was prompted by Most's "shoddy work" which "led to subsequent damage," the $8 million judgment was for "property damage that Most caused" and is therefore covered under the insurance policies. [Filing No. 153 at 18 (citing Filing No. 152-14 at 1); Filing No. 153 at 21.]

In its reply and response, Harleysville contends that Denison's reliance upon the jurors' statements to prove that the jury found that Most had breached its contract due to "shoddy work" is inadmissible hearsay under Federal Rule of Evidence 801 and that the Court may not consider it on summary judgment. [Filing No. 165 at 8.]

In its reply, Denison argues that the jurors' statements are not hearsay because Federal Rule of Evidence 801(d)(2)(D) permits statements "offered against an opposing party and . . . made by the party's agent . . . on a matter within the scope of that relationship and while it existed." [Filing No. 168 at 14-15.] Denison further asserts that "the jurors' statements recorded in the report are covered by multiple exceptions to the rule against hearsay." [Filing No. 168 at 15.] It contends the statements qualify as a present sense impression and/or "have sufficient indicia of truthfulness to be admissible under the residual exception." [Filing No. 168 at 15-16.] It also argues that Indiana Insurance did not challenge the report's admissibility in its response brief and so has waived its right to do so. [Filing No. 168 at 16.] In the alternative, it contends that even if the jurors' statements are not admissible, other evidence shows that the jury's judgment and award were for property damages caused by Most's faulty workmanship. [Filing No. 168 at 16.]

"To be considered on summary judgment, evidence must be admissible at trial." *Prude v. Meli*, 76 F.4th 648, 66 (7th Cir. 2023) (citation omitted). "If the evidence is inadmissible hearsay,

the courts may not consider it." *Id.* (citation omitted).  A statement is hearsay and generally inadmissible if it is "[a]n out-of-court statement offered to prove the truth of the matter asserted." *Lovelace v. McKenna*, 894 F.3d 845, 849 (7th Cir. 2018) (citing *Flournoy v. City of Chi.*, 829 F.3d 869, 876 (7th Cir. 2016); Fed. R. Evid. 801(c)).  However, a statement is not hearsay if it constitutes an admission under Federal Rule of Evidence 801(d)(2), is not offered for the truth of the matter asserted, or if it meets a hearsay exception. *Lovelace*, 894 F.3d at 849.  In the event of multiple layers of hearsay, each layer must be admissible. *Prude*, 76 F.4th at 661; Fed. R. Evid. 805.

Here, Denison is offering the statements for the truth of the matter asserted, which is that the verdict was prompted by Most's "shoddy work" which "led to subsequent damage," and that the $8 million judgment was for "property damage that Most caused." [Filing No. 153 at 18 (citing Filing No. 152-14 at 1); Filing No. 153 at 21.]  Denison argues, nevertheless, that Federal Rule of Evidence 801(d)(2)(D) applies here to exclude the statements from the definition of hearsay.

Rule 801(d)(2)(D) provides that a statement offered against an opposing party and which "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay.  The problem here is the investigator worked on behalf of Indiana Insurance—not Harleysville—and evidence has not been presented to the Court, nor has Denison argued, that the investigator was also working on behalf of Harleysville when conducting the investigation. Rule 801(d)(2)(D) provides only for a statement to be offered against the party who made the statement, which is not Harleysville here.  Therefore, the statements are hearsay and inadmissible.

But even if the report were admissible, the jurors' statements must also be admissible to come in, since the report is a classic hearsay within hearsay problem (the jurors told the

investigator who told the Court).  Yet Denison's and Most's argument that the statements meet the

hearsay exception for present sense impression under Federal Rule of Evidence 803(1) also fails.

> Under Rule 803(1), hearsay is admissible as a present sense impression if the statement describing or explaining an event or condition [was] made while the declarant was perceiving the event or condition, or immediately thereafter.  There are three criteria for the admission of statements under Rule 803(1): (1) the statement must describe an event or condition without calculated narration; (2) the speaker must have personally perceived the event or condition described; and (3) the statement must have been made while the speaker was perceiving the event or condition, or immediately thereafter.  A declarant who deliberates about what to say or provides statements for a particular reason creates the possibility that the statements are not contemporaneous, and, more likely, are calculated interpretations of events rather than near simultaneous perceptions.

*Schindler v. Seiler*, 474 F.3d 1008, 1011 (7th Cir. 2007) (quotations and citations omitted).

Denison and Most have not provided enough information to evaluate whether the criteria have

been met.  Notably, aside from arguing that the jurors "immediately" talked to the investigator,

Denison and Most have not submitted evidence showing the time lapse, without which the Court

cannot determine if it was "immediate."

Similarly, Denison's argument that the residual exception applies also fails.  Federal Rule

of Evidence 807 provides that, even if a hearsay exception from Rule 803 or 804 does not apply,

the statement may still be admissible if it is "supported by sufficient guarantees of trustworthiness."

Fed. R. Evid. 807.  In this case, however, Denison and Most have not offered any evidence related

to the investigator's method of reporting, or anything else that would give the Court guarantees

that the investigator's statements were trustworthy.  Denison cites to *United States v. Ianniello*, 740

F. Supp. 171, 193 (S.D.N.Y. 1990), *rev'd on other grounds sub nom.*, *United States v. Salerno*, 937

F.2d 797 (2d. Cir. 1991), for the proposition that "[a]t least one other federal court has found juror

interviews admissible under [the residual] exception."  [Filing No. 168 at 15.]  But the statements

in *Ianniello* were preserved on tape.  *Ianniello*, 740 F. Supp. at 193 ("The tape-recorded interviews

meet all the criteria set forth in the residual exception. The factors supporting admissibility include the fact that the interviews took place shortly after the trial ended, thereby assuring that the events of the trial and deliberations were still fresh in the jurors' minds."). Further, the investigator himself states at the beginning of his email report, "Sorry for the late report," because the email was sent four days after the jury's verdict was entered, thus casting doubt on his timing and therefore the trustworthiness of his summary. [Filing No. 152-14 at 1.]

Harleysville's objection is **SUSTAINED**. The Court will not consider the jurors' statements against Harleysville.[1]

### B.    Most's Motion to Strike

In its Reply in Support of Cross-Motion for Summary Judgment, Most in a footnote, states that "Harleysville never designated the experts from Wiss, Janney, Elstner Associates, Inc. [("WJE")] as expert witnesses in this case," and that "[t]he Court should strike reference to them, their opinions, and . . . their report." [Filing No. 169 at 4 n.1.]

There are three problems with Most's footnote argument. First, Harleysville specifically disclosed two of the three authors of the WJE report as expert witnesses and disclosed the WJE report as an exhibit. [Filing No. 56 at 2-3.] Second, Most fails to identify the authority it contends demands the result it seeks (*i.e.*, the Federal Rules of Civil Procedure, the Court's Local Rules, the Case Management Plan, etc.). "Seventh Circuit precedent is clear that perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are

---

[1] Indiana Insurance did not object to Denison's and Most's reliance upon the jurors' statements. It has therefore waived the objection. *Walker v. Groot*, 867 F.3d 799, 805-06 (7th Cir. 2017) (holding that when a party fails to timely and properly object to the admission of evidence, the party is deemed to have waived the issue). In any event, the Court's consideration of the statements against Indiana Insurance is not the end-all-be-all that Denison and Most assert it is. The Court explains why below, in Part IV.C.2.

waived." *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) (internal quotations and citation omitted). Third, the Court "does not deem information contained in footnotes as argument. Accordingly, counsel should include all argument in the body of the brief." *Practices & Procedures, Judge Jane E. Magnus-Stinson*, available at https://www.insd.uscourts.gov/sites/insd/files/JMS%20PRACTICES%20AND%20PROCEDURES.pdf (last visited June 24, 2024). Therefore, Most's Motion to Strike, [Filing No. 169 at 4 n.1], is **DENIED**.

## II.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "'Summary judgment is not a time to be coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)). Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The existence of cross-motions for summary judgment does not . . . imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts, different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-

movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id*. at 648.

### III.
#### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard detailed above.[2]

**A.    The Insurers**

*1.    Harleysville*

For policy periods June 1, 2001 through June 1, 2008, Harleysville issued commercial general liability policies ("CGL Policies") to Most.  [Filing No. 8-1 through Filing No. 8-9; *see also* Filing No. 131-15.]   The Harleysville CGL Policies carried a limit of $1,00,000 per occurrence.  [Filing No. 8-1 at 5; Filing No. 8-2 at 4; Filing No. 8-3 at 5; Filing No. 8-6 at 6; Filing No. 8-8 at 5; Filing No. 8-9 at 6.]  Harleysville also issued commercial umbrella insurance policies ("Umbrella Policies") to Most with policy periods beginning June 1, 2004 and ending June 1, 2008.  [Filing No. 131-16 at 2; Filing No. 131-16 at 5; Filing No. 131-17 through Filing No. 131-19.]  Harleysville's Umbrella Policies carried a limit of $5,000,000 per occurrence.  [Filing No. 131-16 at 2; Filing No. 131-17 at 2; Filing No. 131-18 at 2; Filing No. 131-19 at 2.]

*2.    Indiana Insurance*

For policy periods June 1, 2008 through June 1, 2018, Indiana Insurance issued CGL Policies and Umbrella Policies to Most.  [Filing No. 25-1 through Filing No. 25-21.]  The Indiana

---

[2] There is a vast magnitude of evidence in this case.  The Court sets forth only the relevant facts as presented, argued, and specifically relied upon by the parties in their pending motions.  *Grant*, 870 F.3d at 572-73 (stating that the Court need not "scour the record in search of evidence to defeat a motion for summary judgment") (citation omitted); *see also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) (noting that "[i] is not [the court's] function to scour the record in search of evidence to defeat a motion for summary judgment; [the court] rel[ies] on the nonmoving party to identify with reasonable particularity the evidence upon which [it] relies").

Insurance CGL Policies also contained limits of $1,000,000 per occurrence.  [Filing No. 25-1 at 189; Filing No. 25-2 at 9; Filing No. 25-3 at 9; Filing No. 25-4 at 9; Filing No. 25-5 at 65; Filing No. 25-6 at 29; Filing No. 25-7 at 95; Filing No. 25-8 at 9; Filing No. 25-9 at 80; Filing No. 25-10 at 74.]  The Indiana Insurance Umbrella Policies carried an occurrence limit of $9,000,000.  [Filing No. 25-11 at 11; Filing No. 25-12 at 22; Filing No. 25-13 at 25; Filing No. 25-14 at 25; Filing No. 25-15 at 27; Filing No. 25-16 at 23; Filing No. 25-17 at 27; Filing No. 25-18 at 27; Filing No. 25-19 at 21; Filing No. 25-20 at 21; Filing No. 25-21 at 21.]

For ease of reference, the table below illustrates Most's coverage:

| Insurer | Policy Period | | CGL Limits | Umbrella Limits |
|---|---|---|---|---|
| Unknown[3] | 6/1/1992 | 6/1/2001 | Unknown | Unknown |
| Harleysville | 6/1/2001 | 6/1/2002 | $1,000,000 per occurrence per policy period | Not issued |
| | 6/1/2002 | 6/1/2003 | | |
| | 6/1/2003 | 6/1/2004 | | |
| | 6/1/2004 | 6/1/2005 | | $5,000,000 occurrence limit |
| | 6/1/2005 | 6/1/2006 | | |
| | 6/1/2006 | 6/1/2007 | | |
| | 6/1/2007 | 6/1/2008 | | |
| Indiana Insurance | 6/1/2008 | 6/1/2009 | $1,000,000 per occurrence per policy period | $9,000,000 occurrence limit |
| | 6/1/2009 | 6/1/2010 | | |
| | 6/1/2010 | 6/1/2011 | | |
| | 6/1/2011 | 6/1/2012 | | |
| | 6/1/2012 | 6/1/2013 | | |
| | 6/1/2013 | 6/1/2014 | | |
| | 6/1/2014 | 6/1/2015 | | |
| | 6/1/2015 | 6/1/2016 | | $5,000,000 occurrence limit |
| | 6/1/2016 | 6/1/2017 | | |
| | 6/1/2017 | 6/1/2018 | | |

---

[3] The identity of Most's insurer for the policy periods from June 1, 1992 – June 1, 2001 is unknown, a fact upon which all parties agree.  [Filing No. 111 at 13; Filing No. 132 at 14; Filing No. 133 at 6; Filing No. 153 at 12; Filing No. 152-6 at 9; Filing No. 155 at 2; Filing No. 158 at 2.]

**B.      Policy Language**

All parties agree that both the Harleysville and Indiana Insurance CGL Policies have

identical relevant policy language[4] and provide in pertinent part:

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.   Insuring Agreement**

> a.  We will pay those sums that the insured becomes legally obligated to
> pay as damages because of "bodily injury" or "property damage" to
> which this insurance applies.  We will have the right and duty to defend
> the insured against any "suit" seeking those damages.  * * *
>
>                                        * * *
>
> b.  This insurance applies to "bodily injury" and "property damage" only if:
>
> > (1)  The "bodily injury" or "property damage" is caused by an
> > "occurrence" that takes place in the "coverage territory";
> >
> > (2)  The "bodily injury" or "property damage" occurs during the
> > policy period; and
> >
> > (3)  Prior to the policy period, no insured listed under Paragraph
> > **1.** of Section **II** - Who Is An Insured and no "employee"
> > authorized by you to give or receive notice of an
> > "occurrence" or claim, knew that the "bodily injury" or
> > "property damage" had occurred, in whole or in part.  If such
> > a listed insured or authorized "employee" knew, prior to the
> > policy period, that the "bodily injury" or "property damage"
> > occurred, then any continuation, change or resumption of
> > such "bodily injury" or "property damage" during or after the
> > policy period will be deemed to have been known prior to
> > the policy period.

---

[4] Most CGL policies are written on standardized forms developed by an association of insurers, so
the language at issue here is either similar to or identical to most CGL policy language in recent
cases.  *See Sheehan Constr. Co., Inc. v. Cont'l Cas. Co.*, 935 N.E.2d 160, 162 (Ind. 2010)
(discussing the standardization of CGL policies developed by the association known as the
Insurance Service Office).

    c.   "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

    d.   "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim: Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer; Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage" or Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

* * *

**SECTION V – DEFINITIONS**

* * *

13.   "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

* * *

17.   "Property damage" means:

    a.   Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.   Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

[Filing No. 8-6 at 41; Filing No. 8-6 at 54-55; Filing No. 25-1 at 217-18; Filing No. 25-1 at 231-32; Filing No. 25-2 at 195-96; Filing No. 25-2 at 208-09; Filing No. 25-3 at 247-48; Filing No. 25-3 at 260-61; Filing No. 25-4 at 217-18; Filing No. 25-4 at 230-31; Filing No. 25-5 at 189-90; Filing No. 25-5 at 202-03; Filing No. 25-6 at 257-58; Filing No. 25-6 at 270-71; Filing No. 25-7

12

at 221-22; Filing No. 25-7 at 234-35; Filing No. 25-8 at 223-24; Filing No. 25-8 at 236-37; Filing No. 25-9 at 215-16; Filing No. 25-9 at 228-29; Filing No. 25-10 at 205-06; Filing No. 25-10 at 218-19; *see also* Filing No. 131-15; Filing No. 132 at 9-11 (Indiana Insurance stating that the above CGL Policy language is the relevant language of its CGL Policies); Filing No. 133 at 7-8 (Harleysville stating that the above CGL Policy language is the relevant language of its CGL Policies); Filing No. 153 at 12 (Denison stating in its "Statement of Material Facts Not In Dispute" section that "[t]he relevant language of the Harleysville and Indiana Insurance [CGL Policies] are all identical . . . ."); Filing No. 155 at 2 (Most's statement that it "adopts Denison's Statement of Facts [Not In Dispute] and Statement of Material Facts in Dispute"); Filing No. 158 at 2 (Most's statement that it "joins in Denison's brief [in opposition to Indiana Insurance's Motion for Summary Judgment] and incorporates it entirely.").]

The Insurers' Umbrella Policies share the same relevant language as the CGL Policies quoted above, and any minor differences are not at issue currently, and so, for ease of reference, are not identified here.[5]  [Filing No. 25-11 at 59; Filing No. 25-11 at 75-76; Filing No. 25-12 at 35-36; Filing No. 25-12 at 55-57; Filing No. 25-13 at 49; Filing No. 25-13 at 65-66; Filing No. 25-14 at 42-43; Filing No. 25-14 at 62-64; Filing No. 25-15 at 45-46; Filing No. 25-15 at 65-67; Filing No. 25-16 at 39-40; Filing No. 25-16 at 59-61; Filing No. 25-17 at 49-50; Filing No. 25-17 at 69-71; Filing No. 25-18 at 45-46; Filing No. 25-18 at 65-67; Filing No. 25-19 at 37-38; Filing No. 25-19 at 57-59; Filing No. 25-20 at 39-40; Filing No. 25-20 at 59-61; Filing No. 25-21 at 39-40; Filing No. 25-21 at 59-61; Filing No. 131-17 at 7; Filing No. 131-17 at 21-20; Filing No. 131-18 at 5-6; Filing No. 131-18 at 18-19; Filing No. 131-19 at 5-6; Filing No. 131-19 at 18-19; *see*

---

[5] *Compare, e.g.*, Filing No. 25-11 at 76 (the definition of "property damage" in Indiana Insurance's Umbrella Policies is numbered at "21."), *with* Filing No. 131-17 at 21 (the definition of "property damage" in Harleysville's Umbrella Policies is numbered at "18.").

Filing No. 132; Filing No. 133; Filing No. 153; Filing No. 155; Filing No. 158; Filing No. 159; Filing No. 165; Filing No. 166; Filing No. 168; Filing No. 169.]

Because the relevant language is the same across Insurers and their Policies, the Court refers to all Policies as "the Policies" below and only specifies the Insurer when necessary.

### C.    The Plaza Garage and Most's Work on the Plaza Garage

Denison owns and operates a multi-level parking garage at 109 South Capitol Avenue, Indianapolis, IN 46225, known as the "Plaza Garage." [Filing No. 152-1 at 2; Filing No. 152-1 at 6.]  It was constructed in 1978 and contains multiple parking levels, each composed of concrete slabs.  [Filing No. 130-3 at 3; Filing No. 152-1 at 2-3.]  Embedded in those slabs are steel cables, known as post-tensioned tendons, which support the concrete structure.  [Filing No. 152-1 at 2-3.] The tendons within the slabs are encased in plastic sheathing to protect the tendons from exposure to moisture because moisture can cause the tendons to corrode.  [Filing No. 152-1 at 3; Filing No. 153 at 6.]  The tendons must be properly installed, tensioned, and maintained to ensure structural integrity.  [*See* Filing No. 152-1 at 12.]

### D.    Denison Retains Most to Perform Work on the Plaza Garage

From 1992 to 2013, Denison retained Most as its sole contractor to perform work on the Plaza Garage pertaining to concrete repairs, sealant replacement, exposed post-tension tendon repairs, and waterproofing membrane installation.  [Filing No. 130-4 at 48; Filing No. 131-1 at 5.] As relevant later, Most installed a waterproofing membrane on parts of the Plaza Garage across the years 2002 to 2008.  [Filing No. 130-4 at 48.]  Around 2010, Most began to wind down operations. [Filing No. 131-2 at 62-63; Filing No. 131-2 at 69-70.]

### E.     Denison Discovers Issues

In 2014, Denison had retained a different maintenance and repair contractor.  [Filing No. 152-1 at 4.]  In 2016, while the new contractor was performing work on the Plaza Garage, it discovered defective work in the concrete, including "a failed post-tension tendon and heavily corroded mild steel reinforcement bars located inside a horizontal slab repair area."  [Filing No. 152-1 at 6.]  It also discovered failed concrete patches, deteriorated concrete adjacent to the failed patches, and plastic sheathing on post-tension tendons to be in "poor condition in multiple locations due to discovered mechanical damage from sawcuts, punctures, and gouges."  [Filing No. 152-1 at 6.]  The tendons with damaged sheathing were found to be heavily corroded and the new contractor stated that the corrosion was "heavily layered, indicating the corrosion product was not recently formed . . . and [had] been occurring for some time."  [Filing No. 152-1 at 7.]  Similar issues were discovered throughout the Plaza Garage.  [Filing No. 152-1 at 27-30.]  In total, Denison spent over $16 million to complete necessary repairs and lost $5.7 million in revenue due to the repairs.  [Filing No. 152-3 at 20; Filing No. 152-3 at 38; Filing No. 152-5 at 1.]

### F.     Denison Informs Most of Its Discoveries

On August 9, 2016, Denison's President and CEO Mark Pratt wrote Most via email to detail allegedly defective work performed on the Plaza Garage by Most and sought Most's assistance in paying for the repairs.  [Filing No. 130-1.]  Mr. Pratt wrote:

> As you know, we've engaged Arsee Engineers to assistant in the documentation and oversight of most of the work performed on our owned assets.  I have attached two of their reports related to [the Plaza Garage].  Please open Field Report 15, performed on July 29, 2016 and examine.  Take a look at photos 3 and 4.  I'm nearly at a loss for words when I look at those photos.  It's readily apparent that the Most work crew performing work in the past exposed the [post-tension tendon], found it broken and simply nailed it in place to prevent it from dislodging during the concrete pour.  I have to admit, in 32 years of dealing with these sorts of issues, I've never seen a more shoddy measure and lack of caring on the part of a work crew. The cable has been broken and covered over for years, creating greater tension on

those surrounding it.  It took a special sort of uncaring individual to hide that issue.  Both the worker and his supervisor completely disregarded both Denison's long term well-being and the workmanship we were receiving for dollars paid.  Terrible.

Please open Field Report 14, performed on July 26, 2016, and examine.  Take a look at all of the photos.  There is clear evidence of saw-cuts that damaged the sheathing of the PT, leading to corrosion and degradation.  We're now working in an area where we have 5 PT cables broken and a ton of work lay ahead.  Very costly work.

Again, I've never had to come to Most with a concern of this nature.  But the photos and evidence so compelling[ly] point to culpability on the part of Most and your work crews and supervisors that I have little choice.  Given that this is a strange and awkward situation for both of us I'd recommend a conference around our table here at Denison to begin discussions.  I am hopeful that our discussions are cordial, logical and fair . . . as have been all of our discussions in the past. . . . And I want to talk about the concept of Most assisting us in the cost to repair this very poorly maintained area.  I hope you are amenable to this plan and ask if next Tuesday afternoon would work for you.  Please let me know.

[Filing No. 130-1.]

## G.   Denison Sues in Most the Underlying Action

### 1.   Denison's Allegations

In September 2018, Denison filed the Underlying Action against Most in Marion Superior Court alleging that Most and Denison had a contract whereby Most performed work on the concrete at the Plaza Garage, and in turn, Denison paid Most agreed upon sums, amounting to millions of dollars by the time Denison filed the Underlying Action.  [Filing No. 25-22 at 5.] Denison alleged it was damaged by Most's defective work, paying to repair the defective work, and the lost income from its inability to rent parking spaces during repairs.  [Filing No. 25-22 at 9; Filing No. 152-3 at 20; Filing No. 152-3 at 38; Filing No. 152-5 at 1.]  Denison asserted claims against Most for breach of contract and negligence and sought over $22 million in damages. [Filing No. 25-22 at 9-10; Filing No. 152-4 at 25.]

16

2.      *Trial*

The Underlying Action proceeded to trial before a jury in November 2022.  [*See* Filing No. 25-23.]   Harleysville defended Most pursuant to a reservation of rights under the CGL and Umbrella Policies.  [Filing No. 131-20; Filing No. 131-21; Filing No. 131-22; Filing No. 131-23.] Harleysville reserved its rights on the questions of whether there was an "occurrence" and "whether "property damage" had occurred during the Harleysville's Policies.  [Filing No. 131-20 at 5-6; Filing No. 131-21 at 3-11; Filing No. 131-22 at 4-5.]  Harleysville also reserved its right to file a declaratory judgment action.  [Filing No. 131-20 at 8; Filing No. 131-21 at 16; Filing No. 131-22 at 6.]  Indiana Insurance also defended Most pursuant to a complete reservation of rights.  [Filing No. 130-2 at 2; Filing No. 130-2 at 7-8.]

a.      Denison's Expert's Testimony

In the Underlying Action, Denison's expert was Daniel Calabrese of Arsee Engineers.  [*See* Filing No. 131-8 at 3.]  Mr. Calabrese's expert report dated May 18, 2022 noted defective work on the concrete at the Plaza Garage.  [Filing No. 130-3 at 29-31.]  He stated in part that:

> The slab post-tensioned tendon damage discovered on Level 1B was the beginning of many repeated discoveries of the same or similar tendon damage on subsequent elevated floors throughout the garage.  Of particular concern was the mechanical damage to the tendon protective sheathing discovered within precious concrete patch areas. . . .  Mechanical sheathing damage was repeatedly found within previous slab repairs on multiple parking bays throughout the garage.
>
> The mechanical sheathing damage was only one condition of the widespread defective previous repair work found throughout the Plaza Park Garage.  The broad magnitude and repetition of defective work discovered across the elevated parking bays is inconsistent with concrete repair and post-tensioning repair industry standards.

[Filing No. 130-3 at 29.]

The report went on to include an extensive list of "[e]xamples of the various defective slab repair work" with "example photos . . . referenced," including:

- Tendons removed and not replaced (Photo 100)
- Tendons sawcut and not repaired (Photos 96 and 97)
- Tendons found to be failed with missing or damaged sheathing (Photos 154, 164, and 216)
- Sawcut marks on tendon steel strand wires (Photos 19 and 20)
- Mechanically damaged tendon sheathings left untreated (Photos 4 and 5)
- Tendon steel strand left bare (Photos 38 and 181)
- Heavily corroded and failed strand wires left untreated (Photos 26 and 111)
- Improper material used to tape tendon sheathings (Photos 123 and 132)
- Mild steel reinforcement found to have been sawcut and not repaired (Photo 37)
- Mild steel reinforcement found to have been removed and not replaced (Photos 133 and 134)
- Use of plain carbon steel nails and wires to hold mild steel reinforcement and failed tendons in position within previous repairs (Photos 31 through 34; 237 and 238)
- Previously repaired tendons with missing watertight transitions (Photos 67, 71, and 225)
- Lack of watertight details at existing repair coupler hardware (Photos 187, 188, 219, and 241)
- Improperly installed post-tensioning accessories (Photo 177)
- Lack of supplemental concrete cover placed over tendons that already have inadequate cover at previous repairs; includes locations where there was no existing concrete cover present and a previous traffic-bearing membrane system was applied directly over the tendon sheathing, leaving that tendon with no protective concrete cover (Photos 45, 46, and 258).

[Filing No. 130-3 at 29.]

Mr. Calabrese also testified that the damage to the Plaza Garage "could have been present in the slab[s] prior to the installation of the original traffic bearing membrane systems" in 2002 and through 2008, "and was not aware of whether the slab[s] [were] truly put into a sound condition . . . prior to the original membrane application." [Filing No. 130-5 at 4; Filing No. 130-5 at 6.] He further testified that he did not know what maintenance was or was not done at the Plaza Garage throughout the years and agreed that if there were a period when there was not much maintenance done, then existing damage could have gotten exponentially worse. [Filing No. 131-8 at 8.]

18

b.    Other Denison Evidence

Denison's former Executive Vice President, Wendell Bunting, testified that Most's work went "downhill" after the death of a supervisor in December 2008.  [Filing No. 131-2 at 29-30; Filing No. 131-2 at 54-55.] Another witness on Denison's behalf testified that Most started to wind down its operations around 2010.  [Filing No. 131-2 at 62-63; Filing No. 131-2 at 69-70.]

c.    Most's Evidence

At trial, Most presented evidence that, beginning in 2009, Denison decided to cut back on the maintenance performed on the Plaza Garage due to costs.  [Filing No. 131-2 at 78; Filing No. 131-2 at 86-88; Filing No. 131-2 at 94-97.]  Most also retained a forensic engineer from WJE, who made the following statement in a report dated June 18, 2022:

> It is nearly impossible to assign causation of deterioration to faulty or defective repair work without specifically documenting the repairs during and near the time of their completion rather than several years later.  To date, [ ] four different repair contractors and three different engineering consultants are known to have worked on and/or evaluated the Plaza Park Garage on behalf of Denison.  Given that several contractors, including most recently The NEW Group, worked in the garage, determining the party who installed the repairs, defective or not, with any degree of confidence is extraordinarily difficult.  Concrete and tendon deterioration is evident in photographs from repair work performed by others that predates Most's involvement in the garage.  This includes overlapping concrete repair areas and reports of exposed tendons without indication of what type of repair, if any, was performed to restore the tendons.  Both of these conditions were identified by ARSEE as being defective and ARSEE erroneously misattributed these alleged defects to Most.

[Filing No. 130-4 at 8.]

3.    *The Verdict*

The jury returned a verdict finding that Most had breached its contract with Denison and awarded Denison $8 million in damages.  [Filing No. 25-23.]  On the negligence count, however, the jury found Denison to be 51% negligent, and therefore decided in favor of Most and against

Denison and did not award any damages on the negligence claim.  [Filing No. 25-23.]  The verdict

forms were simple:

#### VERDICT FORM B – BREACH OF CONTRACT

VERDICT FOR THE PLAINTIFF ON BREACH OF CONTRACT

We, the Jury, decide in favor of the Plaintiffs, Denison, Inc. and Denison Parking, Inc., and

against the Defendant, Carl E. Most & Son, Inc., on Plaintiffs' claim for breach of contract and

decide Plaintiffs' damages are $ _8,000,000.00_ .

Date: _11/18/2022_

_Jury Banks_
Presiding Juror

**FILED**
NOV 18 2022   (129)
Myla A. Eldridge
CLERK

[Filing No. 25-23 at 3.]

#### VERDICT FORM 5001B – NEGLIGENCE

VERDICT FOR THE DEFENDANT ON COMPARATIVE FAULT

We, the Jury, assign the following percentages of fault:

| | |
|---|---|
| Plaintiffs Denison, Inc. and Denison Parking, Inc. | _51_ % |
| Defendant, Carl E. Most & Son, Inc. | _49_ % |
| Non-Party Arsee Engineering Co | _0_ % |
| Non-Party The New Group Inc. | _0_ % |
| Non-Party The Structural Adhesive Company | _0_ % |
| Non-Party Atlantic Polymer Group | _0_ % |
| Non-Party Carl Walker & Associates | _0_ % |
| Non-Party James & Associates, Inc. | _0_ % |

(The fault percentages listed in the blanks must total 100%).

Because plaintiffs' fault is greater than 50%, we therefore decided in favor of the Defendant,

Carl E. Most & Son, Inc. and against the Plaintiffs Denison, Inc. and Denison Parking, Inc.

Date: _11/18/2022_ .

_Jury Banks_
Presiding Juror

**FILED**
NOV 18 2022   (129)
Myla A. Eldridge
CLERK

20

[Filing No. 25-23 at 4.]

### 4.   *Indiana Insurance's Post-Trial Juror Interview*

Indiana Insurance hired an investigator to interview the jurors after the trial. [Filing No. 152-14.] The investigator's "summary" of his juror interviews stated that he "was able to speak with every juror except for 6, who walked right out of the courthouse without stopping," that "the remaining jurors spoke to him collectively," that all were "in agreement that Most had done shoddy work, and that this work led to subsequent damage at the parking garage," that they believe there "were problems with the garage going all the way to back to the original construction" in 1978, that "they discounted the award down to 8M" because "[t]hey did not want Most to buy Denison a new garage," and that "Denison was negligent in not spending enough money to keep the garage in the best condition." [Filing No. 152-14 at 1.]

### 5.   *Post-trial*

Denison has garnished $489,039.89 from Most's bank account and $100,120 in an insurance premium credit. [Filing No. 131-4 at 2; Filing No. 131-5 at 3.] John Most, owner of Most, passed away in early 2022. [Filing No. 156-1 at 20.] Most is now a dissolved corporation and is no longer in business. [Filing No. 131-6 at 2.]

### H.   **This Lawsuit**

Harleysville initiated this lawsuit on September 15, 2022, before the judgment in the Underlying Action. [Filing No. 1; *see* Filing No. 25-23.] Harleysville's Second Amended Complaint—the operative Complaint, [*see* Filing No. 107; Filing No. 110]—seeks a declaratory judgment that it does not have a duty to indemnify Most under the Harleysville Policies for the judgment entered against Most in the Underlying Action based on multiple arguments. [Filing No. 111.] Indiana Insurance filed a declaratory judgment counterclaim against Harleysville and

crossclaims against Most and Denison seeking the same relief as Harleysville.  [Filing No. 25.]

Denison filed counterclaims against Harleysville and crossclaims against Indiana Insurance also

seeking a declaratory judgment regarding coverage and alleging breach of contract against both

Insurers.  [Filing No. 29; Filing No. 120.]  Most filed a counterclaim against Harleysville for breach

of contract.  [Filing No. 70.]

### I.        Additional Evidence Produced in This Lawsuit

Mr. Calabrese remained an expert for Denison for this litigation and supplemented his May

18, 2022 report with a September 14, 2023 expert report.  [Filing No. 131-7 at 2; *see* Filing No.

131-8 at 3.]  In response to three inquiries, Mr. Calabrese opined in his supplemental report:

> **Question #1** - *Can you determine when the initial damage occurred with respect to each condition described in the May 18, 2022 report?*
>
> **Response #1** - No, I cannot specifically identify when the damage first occurred per each condition referenced in the May 18, 2022 report. However, while the application of vehicular traffic-bearing membranes on post-tensioned concrete slabs occurred, the slabs receiving those systems should have been in structurally sound condition at the time of application. Any damage present should have been properly repaired according to the Building Code and concrete repair industry standards, restoring to a structurally sound condition prior to the commencement of the membrane system installation. Provided the membrane system is properly detailed for the vehicular demand and properly installed over sound concrete substrate that is free of damage, the waterproof nature of the membrane system basecoat layer protects the concrete substrate from infiltration of moisture and deicer chemicals. ARSEE observed membrane-covered slab locations in the garage where horizontal repairs had been previously performed following the membrane installation. The waterproof membrane system was breached at those locations to subsequently perform the repair work and a membrane patch with a different colored topcoat was visible on the repaired areas (Photos 103 through 106; May 18, 2022 report). Lack of proper maintenance of the installed membrane systems contributed membrane areas are sources for moisture and deicer chemical infiltration into the post-tensioned tendon concrete slabs (Photos 269 and 270; May 18, 2022 report). This infiltration coupled with the damage conditions present will result in the initiation of embedded steel reinforcement corrosion upon first exposure. Such damage will actively progress, as discussed further below.
>
> **Question #2** *Please describe the nature of the damage described in the May 18, 2022 report?*

**Response #2** The types of damage described in the May 18, 2022 report were generally progressive in nature. For instance, damage present during previous repair projects that was left untreated or negligently repaired would remain subject to further damage as time progressed. As discussed in the May 18, 2022 report on page 29, the negligent work generally contributed to more extensive damage to the post-tensioned concrete slabs and reinforced concrete pour strips beyond the limits of the previous repairs. The process of active corrosion of embedded steel reinforcement initiated upon moisture and deicer chemical contact, and, over time, repeated exposure eventually resulted in significant corrosion damage to the post-tensioned tendons and mild steel reinforcement bars. The continued corrosion activity damaged the surrounding concrete. The resulting damage throughout the garage required extensive and costly repairs to correct the defective work.

**Question #3** *Can you tell specifically what damage occurred in which years?*

**Response #3** No, I cannot specifically identify what damage occurred in which years. While the damage was progressive, as described above, the progression itself is driven by unknown factors, such as the extent of exposure to moisture and deicer chemical infiltration over time. This damage would be exacerbated if it were improperly repaired or left untreated.

[Filing No. 131-7 at pp. 2-3.]

During Indiana Insurance's corporate deposition in this litigation, its designee testified that property damage had occurred during "at least" the June 2008 – June 2012 Indiana Insurance policy periods. [Filing No. 152-12 at 20.]

### J. Pending Motions

Pending before the Court are the following motions: Indiana Insurance's Motion for Summary Judgment, [Filing No. 130]; Harleysville's Motion for Summary Judgment, [Filing No. 131]; and Denison's Cross-Motion for Summary Judgment, [Filing No. 152], for which Most filed a Notice of Joinder, [Filing No. 159].

### IV.
### DISCUSSION

At the outset, the Court notes that this is a complex case given the positions of the parties and the Underlying Action. At times, the Insurers raise different arguments on the same or similar

issues, and so do both Denison and Most.  The Court does it best to separate the arguments and the issues, and to clearly delineate its holdings.

The majority of the parties' Cross-Motions for Summary Judgment ask the Court to construe whether the judgment in the Underlying Action comes within the Policies' grants of coverage.  The Policies' grants of coverage, in short form and as relevant here, provide that the insurance only applies if three requirements are met: (1) the property damage is "caused by an 'occurrence' that takes place in the coverage territory"; (2) the property damage "occurs during the policy period"; and (3) the insured did not did not know that the property damage had occurred, in whole or in part (this requirement is known as the "Known Claim Exclusion").  *See supra* discussion Part III.B. (for full language); *Indiana Ins. Co. v. Kopetsky*, 14 N.E.3d 850, 852-53 (Ind. Ct. App. 2014) (describing the third requirement as the Known Claim Exclusion).  The parties assert arguments as to each coverage requirement.  The parties also assert arguments not related to coverage and contract interpretation.

Given the complexity of the case and the number of arguments presented, the Court proceeds by first setting forth the general law for the construction of insurance contracts that governs the Court's determination of the issues presented before addressing each coverage argument raised by the parties.  After the issues of coverage have been resolved, the Court addresses the remaining non-coverage arguments.

### A.    Applicable Law for the Construction of Insurance Contracts

When the Court exercises diversity jurisdiction over an action, it is "obliged to apply state law to the substantive issues in the case."  *Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635, 639 (7th Cir. 2015) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, (1938)).  The parties do not dispute that Indiana law governs this action.  Accordingly, this Court must "apply the law that

would be applied by the Indiana Supreme Court." *Lodholtz*, 778 F.3d at 639.   "If the Indiana Supreme Court has not spoken on the issue, [the Court] generally treat[s] decisions by the state's intermediate appellate courts as authoritative, unless there is a compelling reason to think that the state supreme court would decide the issue differently." *Id.*

Under Indiana law, "insurance contracts are subject to the same rules of interpretation as other contracts." *Ebert v. Illinois Cas. Co.*, 188 N.E.3d 858, 864 (Ind. 2022) (citations omitted). Ambiguous policy provisions are construed in favor of the insured; unambiguous language is given its plain and ordinary meaning. *Id.* (citations omitted).  The interpretation of an insurance policy is primarily a question of law for the court, and therefore well-suited for summary judgment. *Id.* (citation omitted).   "It is the burden of a person or entity seeking coverage under an insurance policy to establish that the claim at issue comes within the policy's insuring provisions." *Scottsdale Ins. Co. v. Harsco Corp.*, 199 N.E.3d 1210, 1219 (Ind. Ct. App. 2022), *trans. denied*, 208 N.E.3d 1253 (Ind. 2023) (citing *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 727 (Ind. Ct. App. 2004), *trans. denied*, 812 N.E.2d 805 (Ind. 2004)).

When construing an insurance contract, the Court begins with the language of the initial grant of coverage before addressing any exclusionary language.  *See Sheehan*, 935 N.E.2d at 162 ("[CGL] policies begin with a broad grant of coverage, which is then limited in scope by exclusions.  Exceptions to exclusions narrow the scope of the exclusion and, as a consequence, add back coverage.  However, it is the initial broad grant of coverage, not the exception to the exclusion, that ultimately creates (or does not create) the coverage sought."); *Indianapolis Racquet Club, Inc. v. Cincinnati Ins. Co.*, 658 F. Supp. 3d 683, 691 (S.D. Ind. 2023) (applying Indiana law and stating that "exclusions don't matter unless the insured first shows that the policy covers its claim"); *Hartford Cas. Ins. Co. v. Evansville Vanderburgh Pub. Libr.*, 860 N.E.2d 636, 646 (Ind.

Ct. App. 2007) ("[I]f the insuring clause does not extend coverage, one need look no further.  If coverage exists, exclusions must then be considered.")

**B.      Coverage Under Harleysville's Policies (June 2001 – June 2008)**

In support of its Motion for Summary Judgment, Harleysville argues that there is no coverage under its Policies because Denison and Most did not produce sufficient evidence from which a reasonable jury could conclude that property damage occurred during its Policies (the second requirement of coverage as noted above).  In response, Denison argued that there is sufficient evidence, and Most "incorporated" Denison's arguments into its response and further argued that Harleysville is estopped from asserting this coverage defense.  The Court turns first to the Harleysville-Most estoppel arguments, for if estoppel precludes Harleysville from asserting its coverage defense regarding to whether property damage occurred during its Policies, then the Court need not consider the merits of that defense.

*1.      Estoppel*

In support of its Motion for Summary Judgment, Harleysville argues that its Policies only provide coverage for "property damage" "if it occurs during the policy periods," and that Denison and Most, who have the burden, "have not produced any evidence showing that 'property damage' occurred during Harleysville's policy periods."  [Filing No. 133 at 16.]

In its response, Most asserts that "Harleysville is estopped from asserting its coverage defense that the damage occurred outside of its policy periods, or it has waived its coverage defense."  [Filing No. 155 at 4.]  It asserts that "[t]o properly disclaim coverage, an insurer must conduct its own coverage investigation," citing to *Trisler v. Indiana Ins. Co.*, 575 N.E.2d 1021, 1023 (Ind. Ct. App. 1991), and that "Harleysville made no substantial investigation into determining when the property damage occurred" and waited until after Mr. Most died to bring the

26

declaratory judgment action.  [Filing No. 155 at 4.]  It asserts that Harleysville's "inactions" prejudiced Most and that "Harleysville admitted that it breached its own obligation to investigate," which shows that Harleysville breached the duty of good faith and fair dealing and is therefore estopped from denying coverage on the argument that property damage did not occur during its Policies.  [Filing No. 155 at 6-7.]  Most asserts further that "[s]tatutory law also supports that the insurer must determine coverage promptly," citing to Indiana's Unfair Claims Settlement Practices Act, Indiana Code § 27-4-1-4.5(2) and (4).  [Filing No. 155 at 5-6.]

In response, Harleysville argues that because it defended Most under a reservation of rights, it is neither estopped from asserting its defense that property damage did not occur during its Policies, nor did it breach the duty of good faith and fair dealing.  [Filing No. 165 at 14.] Harleysville asserts that Most's argument is "based upon a novel exception to the estoppel doctrine [and] is without merit and should be rejected."  [Filing No. 165 at 14.]  It also argues that Most's argument is not supported by the record and, in any event, Most's allegations regarding the duty of good faith and fair dealing were stricken by the Court and cannot be asserted here.  [Filing No. 165 at 15-19 (citing Filing No. 164).]  It contends that the cases that Most cites do not support the premises for which they are cited and that Most was not prejudiced because Harleysville's reservation of rights explicitly stated that it was reserving its right to assert that property damage did not occur during its Policies.  [Filing No. 165 at 19-20.]

In reply,[6] Most reiterates its arguments.  [Filing No. 169.]

Under Indiana law, "[e]stoppel is an equitable doctrine designed to prohibit an injustice that would occur without its application." *Little v. Progressive Ins.*, 783 N.E.2d 307, 315 (Ind. Ct. App. 2003) (citation omitted).  "Although estoppel has been variously defined, it is a concept by which one's own acts or conduct will prevent one from claiming a right to the detriment of another party who was entitled to and did rely on one's conduct." *Id.* (citing *Brown v. Branch*, 758 N.E.2d 48, 51-52 (Ind. 2001)).  Thus, the doctrine can serve to prevent an insurer from raising a coverage defense.  *Employers Ins. of Wausau v. Recticel Form Corp.*, 716 N.E.2d 1015, 1028 (Ind. Ct. App. 1999); *see also Transcon. Ins. Co. v. J.L. Manta, Inc.,* 714 N.E.2d 1277, 1280 (Ind. Ct. App. 1999).

Indiana follows the general rule that the doctrine of estoppel is not available to create or extend the scope of coverage of an insurance contract.  *Recticel Form Corp.*, 716 N.E.2d at 1028; *see also J.L. Manta, Inc.,* 714 N.E.2d at 1280; *Little*, 783 N.E.2d at 316; *Allstate Ins. Co. v. Tozer*, 392 F.3d 950, 956 (7th Cir. 2004) (applying Indiana law).  "The rationale for the rule is that an insurance company should not be forced to pay for a loss for which it had not charged a premium."

---

[6] The Court notes that it does not appear that Most cross-moved for summary judgment such that it would be entitled to a reply.  The movant gets the last word, and it is far from clear that Most moved for summary judgment on this ground.  *See Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utils.*, 410 F. Supp. 3d 943, 949 (S.D. Ind. 2019) ("The purpose for having a motion, response and reply is to give the movant the final opportunity to be heard and to rebut the non-movant's response, thereby persuading the court that the movant is entitled to the relief requested by the motion.") (quotations and citation omitted).  Most "joined" Denison's cross-motion, but Denison's cross-motion appears to only move for summary judgment on its declaratory judgment claim regarding coverage for other reasons not relating to estoppel.  [*See* Filing No. 153.]  And Most's Response in Opposition to Harleysville's Motion for Summary Judgment, [Filing No. 155], does not appear to independently move for summary judgment based of its estoppel argument, but rather is just a brief in opposition.  [Filing No. 155 at 2 (stating that Most "submits the following Brief opposing [Harleysville's] Motion for Summary Judgment" and concluding that "[f]or the foregoing reasons, the Court should deny [Harleysville's] Motion for Summary Judgment").]  Nevertheless, the Court considers the reply out of an abundance of caution and because no party objected to Most's filing of the reply.

*Recticel Form Corp.*, 716 N.E.2d at 1028 (citing *J.L. Manta, Inc.*, 714 N.E.2d at 1281); *see also*

*Founders Ins. Co. v. Olivares*, 894 N.E.2d 586, 592 (Ind. Ct. App. 2008) (citation omitted).  Indiana

courts, however, have recognized two exceptions.  The first exception exists where an insurer

assumes the defense of an action on behalf of its insured without a reservation of rights but with

knowledge of facts which would have permitted it to deny coverage.  *Recticel Form Corp.*, 716

N.E.2d at 1028 (citing *J.L. Manta, Inc.*, 714 N.E.2d at 1281).  The second exception exists where

an insurer misrepresents the extent of coverage to an insured, thereby inducing the insured to

purchase coverage which does not in fact cover the disputed risk.  *Id.*

The Court's analysis begins with noting that the Court only considers Most's arguments

that Harleysville is estopped from denying coverage due to the timing of its declaratory judgment

action.  In other words, the Court does not consider Most's arguments regarding estoppel due to a

breach of the duty of good faith and fair dealing relating to Harleysville's investigation of the

claims made under the Policies, including its argument that a violation of the Indiana Unfair Claims

Settlement Practices Act is evidence of a breach of the duty of good faith and fair dealing.  [*See*

Filing No. 155 at 4-8; Filing No. 169 at 3-5.]  The Court does not consider these arguments because

the Court's February 7, 2024 Order struck all of Most's allegations regarding an affirmative defense

and a counterclaim based on a breach of the duty of good faith and fair dealing and all other new

and untimely allegations.  [Filing No. 164.]  Further, the only argument from Most's Response in

Opposition to Harleysville's Motion for Summary Judgment that appears in its Statement of Claims

and Defenses is that Harleysville is estopped "from disclaiming coverage because [it] waited too

long to prosecute [its] action for declaratory judgment."  [Filing No. 109.]  Therefore, the Court

only considers this argument and does not consider arguments outside of the scope of theories

presented in the Statement of Claims and Defenses, *see Jackson v. Regions Bank*, 838 F. App'x

195, 198 (7th Cir. 2021) (finding "no abuse of discretion in the district court's enforcement of its requirement that [the plaintiff] specifically state his theories of relief" in the Statement of Claims), or arguments that have been struck from the record in accordance with the Court's February 7, 2024 Order, [Filing No. 164].

With the appropriate scope in mind, the Court turns to Most's estoppel argument and finds that it is based upon a novel exception to Indiana's estoppel doctrine, so much so that Most does not even attempt to argue that its argument fits within either exception. [*See* Filing No. 155 at 3-8; Filing No. 169 at 3-5.] To be sure, the Court's analysis can be appropriately concluded based on such a failure. *Rock Hemp Corp.*, 51 F.4th at 704 ("Seventh Circuit precedent is clear that perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived.") (internal quotations and citation omitted).

Nevertheless, the Court proceeds to explain why the exceptions do not apply and why Most's estoppel argument is unpersuasive. The first exception does not apply because Harleysville did defend Most pursuant to an explicit reservation of rights, including on the issue of whether property damage occurred during its policy periods. [Filing No. 131-20 at 5-6; Filing No. 131-21 at 3-11; Filing No. 131-22 at 4-5.] And the second exception does not apply because there has been no allegation that Harleysville ever misrepresented the extent of coverage thereby inducing the insured to purchase coverage which did not cover the disputed risk.

Even though the exceptions do not apply, Most argues for this Court to recognize a new exception. Yet it does not cite any authority (*e.g.*, Indiana Supreme Court cases, Indiana Court of Appeals cases, treatises, law review articles, other states' laws, etc.) from which the Court could conclude that Indiana law demands such a result or that the Indiana Supreme Court would find its argument persuasive if the issue were before it now. *See Sun Life Assurance Co. of Can. v. Wells*

*Fargo Bank, N.A.*, 44 F.4th 1024, 1031 (7th Cir. 2022) ("Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), and 28 U.S.C. § 1652, our task is to decide a question of state law 'as it either has been determined by the highest court of the state or as it would be by that court if the present case were before it now.'") (quoting *H.A.L. NY Holdings, LLC v. Guinan*, 958 F.3d 627, 632 (7th Cir. 2020)); *see also Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002).

Although Most does cite some authority in its argument relating to the passage of time, the authority is inapplicable here.  Most relies upon *Miller v. Dilts*, 463 N.E.2d 257, 263 (Ind. 1984), for the proposition that Harleysville's "inaction"/timing of its declaratory judgment action prejudiced Most.  [Filing No. 155 at 5.]  But *Miller* is about prejudice to the insurer when the insured does not give timely notice of a claim and is thus a backward application and does not support the premise for which Most argues.  *Miller*, 463 N.E.2d at 261 (holding that "[a]n insurance company must show actual prejudice from an insured's noncompliance with the policy's cooperation clause before it can avoid liability under the policy") (citation omitted).

Even if Most had cited pertinent authority, its argument is based upon an unreasonable view that the timing of the declaratory judgment action impacted evidence.  It argues that "[t]here cannot be a more prejudicial situation than this, where the declaratory judgment action is being prosecuted after all the evidence on this issue is gone due to the passage of time."  [Filing No. 155 at 6.]  But a review of the timeline of this case and the Underlying Action reveals a reasonable passage of time and proceeding of events, especially given the complexity of issues and facts. Denison wrote to Most in August 2016 regarding issues it had discovered with Most's work dating back several years.  [Filing No. 130-1 at 2.]  Two years later in September 2018, Denison filed the Underlying Action against Most in state court.  [Filing No. 25-22.]  *See Denison Parking, Inc. v. Carl E. Most & Son, Inc.*, 49D05-1809-PL-037971 (Marion Sup. Ct.).   Immediately after

Harleysville became aware of the Underlying Action and potential coverage issues, it notified Most and its personal counsel of its position, defended Most pursuant to its reservation of rights, and retained experts to assist in Most's defense.  [Filing No. 131-11; Filing No. 131-20; Filing No. 131-21; Filing No. 131-22; Filing No. 131-23.]  The Underlying Action did not proceed to trial until November 14, 2022.  Shortly before the Underlying Action proceeded to trial, on September 15, 2022, Harleysville filed its Complaint in this case, presumably in anticipation of an unfavorable judgment against Most for which it may have the duty to indemnify.  [Filing No. 1; *see also* Filing No. 8.]  But there is no evidence from which to conclude that Harleysville was dilatory in its filing of its declaratory judgment action relating to the judgment against Most, that it knew that Mr. Most was going to pass away in early 2022, or that it purposefully waited for such an unfortunate event to occur.

In the end, Most misunderstands the law of estoppel as it is applied in the context of preventing an insurer from asserting a coverage defense, cites cases that are not applicable, and stretches the facts of this case relating to timing too far.  Even when these facts are taken in the light most favorable to Most, the doctrine of equitable estoppel is not applicable here.  Harleysville properly asserts its coverage defense that Denison and Most did not establish evidence from which a reasonable jury could conclude that property damage occurred during its Policies, which the Court now proceeds to address.

2.   *Property Damage During Harleysville's Policies*

In support of its Motion for Summary Judgment, Harleysville argues that its Policies only provide coverage for "property damage" "if it occurs during the policy periods," and that "Denison has not produced any evidence showing that 'property damage' occurred during Harleysville's policy periods."  [Filing No. 133 at 16.]  It highlights that "Denison's expert has opined that he

'cannot specifically identify when the damage first occurred per each condition referenced in the May 18, 2022 report" or when "'property damage' occurred." [Filing No. 133 at 16-17 (citing Filing No. 131-7 at 2-3; Filing No. 131-8 at 6-7; Filing No. 131-8 at 12).] It also argues that there is evidence that "'property damage' likely occurred after the Harleysville policy periods ended," pointing to the fact that one of Denison's witnesses testified in the Underlying Action that Most's work went "downhill" after the death of a supervisor in December 2008, which was after Harleysville's Policies had expired. [Filing No. 133 at 17-18 (citations omitted).]

In response, Denison argues that "disputed fact issues preclude summary judgment" on Harleysville's argument. [Filing No. 153 at 28.] It contends that its "only burden is to prove sufficient coverage to pay its judgment, which is has proven through the undisputed evidence and Indiana law showing that sufficient coverage exists under the Indiana Insurance policy periods to pay Denison's judgment." [Filing No. 153 at 28; *see also* Filing No. 153 at 25-28.] It contends that "[i]t is Indiana Insurance, not Denison, who must prove that Harleysville should contribute to paying the judgment" because Indiana Insurance has admitted that property damage occurred during at least some of their Policies. [Filing No. 153 at 28; *see also* Filing No. 153 at 25-28.] It also asserts, however, that "even if [it] had any such burden [to prove that property damage occurred during the Harleysville policy period], there is evidence from which a jury could find that property damage occurred during Harleysville's polic[ies]." [Filing No. 153 at 28.] The evidence it contends could support a jury verdict in its favor is Most's application of a waterproofing membrane beginning in 2002 and ending in 2008. [Filing No. 153 at 28.] It argues that after the application of the waterproofing membrane, repairs were made as evidenced by a different color topcoat marking the repaired areas, and that this "observation [of the different colored topcoat in certain areas] suggest that the [the repairs] post-dated the application of the membrane in those

33

areas," which "constitute[s] evidence that the repairs were completed sometime after 2002, when Most began applying the membrane." [Filing No. 153 at 29.]  It also notes that Indiana Insurance "contends that property damage did occur during all of the Harleysville policy periods" and that Harleysville itself conceded that "there is potential" that property damage occurred during its Policies.  [Filing No. 153 at 29-30 (citing Filing No. 152-11 at 27; Filing No. 152-12 at 20).]

Most, in response to Harleysville's arguments, "incorporate[d] Denison's [a]rguments regarding this issue." [Filing No. 155 at 4.]

In reply, Harleysville reiterates that Denison and Most, not the Insurers, have the burden to prove the Harleysville's Policies are triggered and that Denison and Most are improperly trying to shift that burden to Indiana Insurance.  [Filing No. 165 at 2; Filing No. 9.]  Harleysville reiterates that Denison's own expert stated that he could not identify when the damage first occurred per each condition.  [Filing No. 165 at 9.]  It further highlights that no witnesses in the Underlying Action could testify as to when any of the various repair patches were made, meaning that Denison is speculating as to when the damage occurred which is insufficient.  [Filing No. 165 at 10 (citing Filing No. 131-2 at 16).]  Harleysville asserts that Denison also ignores other evidence showing that "property damage" occurred after the Harleysville Policies had ended, such as testimony from one of Denison's witnesses "that Most's work at the Plaza Garage was excellent until the death of a supervisor" in December 2008, after Harleysville's policy periods had ended, and Denison's decrease in spending for repairs around 2009, which contributed to "property damage." [Filing No. 165 at 11-12 (quoting Filing No. 131-2 at 29-30; Filing No. 131-2 at 54; citing Filing No. 131-2 at 78-79; Filing No. 131-2 at 86-88; Filing No. 131-2 at 94-97; Filing No. 131-2 at 104-05; Filing No. 131-2 at 107).]

In reply,[7] Most reiterates the arguments that Denison asserted in its response and further asserts that "[w]eakness in evidence is different from finding the absence of evidence and because Most has designated evidence that property damage occurred during Harleysville's policy periods, it must be allowed to present that evidence to a jury." [Filing No. 169 at 3 (citation omitted).]

The parties' arguments focus on who must establish whether property damage to the Plaza Garage occurred during the Harleysville Policies and if that party met its burden. The Court starts with analyzing who has the burden. Indiana law is clear that "[i]t is the burden of a person or entity seeking coverage under an insurance policy to establish that the claim at issue comes within the policy's insuring provisions." *Scottsdale Ins. Co.*, 199 N.E.3d at 1219 (citing *PSI Energy, Inc.*, 801 N.E.2d at 727). Thus, Denison and Most have the burden to establish that damage occurred during Harleysville's Policies in order to recover under those Policies. And contrary to Denison's argument, even if Indiana Insurance has admitted that property damage occurred during some of the Indiana Insurance Policies (which the Court addresses below in a separate section), the burden does not shift. Denison and Most must still establish that property damage occurred during Harleysville's Policies since they are seeking coverage under both the Harleysville and Indiana Insurance Policies.

With the burden properly attributed to Denison and Most, the Court turns to analyze whether Denison and Most have met their burden. The answer depends on the language of the Policies, how Indiana law views that language, and the evidence set forth. The Harleysville Policies state that Harleysville:

> will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies. . . . This insurance

---

[7] The Court notes that, similar to footnote 6 *supra*, it does not appear that Most cross-moved for summary judgment such that it would be entitled to a reply. Nevertheless, the Court considers the reply out of an abundance of caution and because no party objected to Most's filing of the reply.

applies to . . . "property damage" only if . . . [t]he . . . "property damage" is caused by an "occurrence" that takes place in the "coverage territory" [and] . . . occurs during the policy period.

*See supra* discussion Part III.B.

This language unambiguously limits Harleysville's coverage obligation to liability for property damage caused by an occurrence only if it takes place during the policy period. This approach is known as the "injury-in-fact" approach and Indiana courts are required to apply its plain meaning. *See Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1057, 1060-61 (Ind. 2001), (to trigger a policy that had "during the policy period" language, damage must have occurred in the policy's period, and if coverage is sought under multiple policies, then continued damage must have occurred in the subsequent policies to trigger coverage); *PSI Energy, Inc. v. Home Ins., Co.*, 801 N.E.2d 705, 733-34 (Ind. Ct. App. 2004) (following *Dana* and holding that the insured must prove that the damage was caused during the relevant policy periods to trigger coverage); *see also Huntzinger v. Hastings Mut. Ins. Co.*, 143 F.3d 302, 315 (7th Cir. 1998) ("The general rule under Indiana law is consistent with the 'injury-in-fact' theory in that '[t]he time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time when the complaining party was actually damaged.'") (quoting *U.S. Fidelity & Guar. Co. v. Am. Ins. Co.*, 345 N.E.2d 267, 270 (Ind. Ct. App. 1976)); *Grange Mut. Cas. Co. v. West Bend Mut. Ins. Co.*, 946 N.E.2d 593, 596 (Ind. Ct. App. 2011) ("we agree that the time of the damage, as opposed to the time of the alleged negligent conduct that caused the damage, is the triggering event"); *Great Lakes Chem. Corp. v. Int'l Surplus Lines Ins. Co.*, 638 N.E.2d 847, 854 (Ind. Ct.

App. 1994) ("the trigger for coverage is the time when the complaining party was damaged").[8] Indeed, this is a rule of law that Denison itself recognizes elsewhere in its brief and which Most "incorporated" into its arguments.  [Filing No. 153 at 21 ("Indiana law applies the 'injury-in-fact' trigger of coverage approach.  The insured need only prove that the harmful condition at issue *caused damage during the relevant policy periods* to trigger coverage.") (emphasis added) (citing *PSI Energy, Inc.*, 801 N.E.2d at 733-34); Filing No. 155 at 3; Filing No. 169 at 2.]

Since it is clear that Denison and Most have the burden, *Scottsdale Ins. Co.*, 199 N.E.3d at 1219, and their burden is to produce admissible evidence from which a reasonable jury could find that damage actually occurred during the Harleysville Policies in order to trigger Harleysville's coverage obligation, *Dana Corp.*, 759 N.E.2d at 1060-61; *PSI Energy, Inc.*, 801 N.E.2d at 733-34, the Court now turns to that evidence.  Harleysville contends that Denison and Most have not produced any evidence showing that property damage took place during Harleysville's Policies. The Court agrees.

To start, Denison's own expert opined that he "cannot specifically identify when the damage first occurred per each condition referenced in the May 18, 2022 report" and "cannot specifically identify what damage occurred in which years."  [Filing No. 131-7 at 2-3; *see also* Filing No. 131-8 at 6-7; Filing No. 131-8 at 12; *see also supra* discussion Part III.G.2.a., Part III.I.] Further, there is no evidence before the Court detailing when any of the various repair patches were completed from which a determination could be made.  Denison argues that since Most

---

[8] Indiana Insurance argues for a different trigger of coverage approach in its brief in support of its argument that if the requirement of an "occurrence" is met, then the language of the Policies and Indiana law require that all Policies during which Most performed work are triggered, regardless of whether property damage actually occurred in those policy periods, and that the indemnity obligation is then pro-rated across all triggered Policies based on time on the risk.  [Filing No. 132 at 21-23; Filing No. 166 at 10-16.]  The Court addresses Indiana Insurance's argument in Part IV.C.1. below and explains why Indiana Insurance's argument fails.

applied a waterproofing membrane to the Plaza Garage across the years 2002 – 2008, and patches of it were later breached to perform repairs and re-covered with a different color membrane, which in 2016 were discovered to have been faulty membrane repairs, then a reasonable jury can conclude that the faulty membrane repairs occurred in 2002, or at least during the Harleysville Policies. [Filing No. 153 at 29.] But even if the repairs were faulty and caused damage immediately, Denison's argument completely speculates as to the date of repairs. Just because a repair was made at some point to the membrane, it does not follow that the repair was made in 2002, or any date before the end of Harleysville's Policies on June 1, 2008. This argument is purely speculative, unsupported, and insufficient. Denison and Most had several years and two different discovery periods to produce evidence of when certain repairs were made on certain parts of its property, and it has failed to do so. While the Court must take all reasonable inferences in the non-movant's favor, Denison and Most are asking the Court to apply an unreasonable inference and extrapolate a date from thin air, which it cannot do.

Moreover, there is evidence that Denison spent little money on repairs at the Plaza Garage beginning in 2009, which was after Harleysville's Policies had ended, and that this decrease in spending contributed to property damage. [See Filing No. 131-2 at 78-79; Filing No. 131-2 at 86-88; Filing No. 131-2 at 94-97; Filing No. 131-2 at 104-05; Filing No. 131-2 at 107; Filing No. 131-13 at 2; Filing No. 131-14 at 2-3.] A Denison witness also testified at the trial in the Underlying Action that Most's work at the Plaza Garage was excellent until the death of a supervisor in December 2008, which was also after the end of the Harleysville Policies. [Filing No. 131-2 at 29-30; Filing No. 131-2 at 54.]

It is likewise insufficient that Indiana Insurance contends that property damage occurred during Harleysville's Policies. Indiana Insurance's contention is not supported by any evidence

showing that property damage occurred during the Harleysville Policies and there is no evidence that Indiana Insurance was speaking on behalf of Harleysville during its deposition. [*See* Filing No. 152-12 at 20.]  And lastly, Denison's argument that Harleysville "conceded that 'there is potential' that property damage could have occurred during all of its policy periods" does not establish anything of value for Denison or Most at this point in the case. [Filing No. 153 at 29-30 (quoting Filing No. 151-11 at 27).]  The testimony Denison relies upon states:

> Q:  Ms. Luken, right before the break, I think you told me that Harleysville had defended Most under all of the potentially applicable policies.  Is that right?
>
> A:  That's my understanding, yes.
>
> Q:  And which policies are potentially applicable?
>
> A:  All of the policies that we had talked about before, from 2001 to 2008.
>
> Q:  Including both the primary and the umbrella policies?
>
> A:  Yes.
>
> Q:  Is that because property damage may have occurred during all of those policy years?
>
> A:  Yes, there is potential that that could be the case.
>
> Q:  And just to be clear, Harleysville doesn't know whether property damage occurred in all or any of those policy years; right?
>
> A:  Correct.  There has been no testimony or evidence submitted as to whether or not there's been property damage that occurred in any or all of those policy years.

[Filing No. 152-11 at 27-28.]  When read in context, it is clear that Harleysville was not admitting that property damage had occurred during its Policies and that its indemnification obligation was triggered, but rather was admitting that there was a potential for such evidence to exist and that is why its duty to defend was triggered.  "[A]n insurer's duty to defend is broader than its duty to

indemnify." *Ebert*, 188 N.E.3d at 865 (citation omitted).  Thus, a duty to defend does not establish a duty to indemnify.  Further, a potential to exist and actually existing are not the same.

In sum, Denison's and Most's arguments misinterpret Indiana law and stretch the evidence. Denison and Most were required to establish evidence that property damage occurred during the Harleysville Policies to trigger coverage and have failed to submit admissible evidence from which a reasonable jury could conclude that either of them have met that burden.  Harleysville is therefore entitled to judgment as a matter of law on this issue.  The Court **GRANTS** Harleysville's Motion for Summary Judgment, [Filing No. 131], to the extent that it declares that Harleysville has no obligation to provide coverage under the Harleysville Policies because Denison and Most failed to establish evidence from which a reasonable jury could conclude that property damage had occurred during the Harleysville Policies.[9]

It follows then that Denison's counterclaim seeking a declaratory judgment that there is coverage under the Harleysville Policies fails and must be **DISMISSED**.  Likewise, because there is no coverage under the Harleysville Policies, Denison's and Most's breach of contract counterclaims against Harleysville are also **DISMISSED**.  Without a right to coverage under the insurance contract, there can be no contractual breach.[10]

---

[9] It is not clear that Denison cross-moved for summary judgment seeking a declaration that property damage occurred during the Harleysville Policies.  [*See* Filing No. 153.]  Rather, it appears Denison only opposed Harleysville's motion and cross-moved for summary judgment on its declaratory judgment claim regarding coverage for other reasons not related to property damage occurring during the Harleysville Policies.  [*See* Filing No. 153 at 30 ("In sum, Harleysville is not entitled to summary judgment on [the issue of property damage during its Policies].  Nevertheless, Denison is still entitled to summary judgment against Indiana Insurance with respect to coverage.").]  But out of an abundance of caution, to the extent Denison seeks a declaration that property damage occurred during the Harleysville Policies, Denison's Cross-Motion for Summary Judgment, [Filing No. 152], is **DENIED.**

[10] Because Harleysville owes no coverage, the Court need not and does not consider Harleysville's alternative arguments relating to coverage in its Motion for Summary Judgment.

40

**C.      Coverage Under Indiana Insurance Policies (June 2008 – June 2018)**

The Court now turns to Indiana Insurance's, Denison's, and Most's arguments regarding

coverage under the Indiana Insurance Policies.  As to the Indiana Insurance Policies, the remaining

parties assert arguments as to each of the three coverage requirements stated at the beginning of

Part IV. above.  The Court begins with addressing Denison's argument in its cross-motion for

summary judgment (and by extension, Most's joinder and incorporation of Denison's argument)

that Indiana Insurance admitted that property damage occurred during its Policies.

*1.      Property Damage During Indiana Insurance Policies*

In its Motion for Summary Judgment, Indiana Insurance argues that the "multiple trigger

approach" as identified by *Eli Lilly & Co. v. Home Insurance Co.*, 482 N.E.2d 467 (Ind. 1985),

applies to this case, not the "injury-in-fact" approach, and that if the Court were to find coverage

for the judgment in the Underlying Action, then both Harleysville and Indiana Insurance are liable

on a pro-rata basis to be apportioned using the "time on the risk" method.  [Filing No. 132 at 21-

23.]

In its Cross-Motion, Denison (and Most by its Joinder) assert that Indiana "applies the

'injury-in-fact' trigger of coverage approach" and that it "need only prove that the harmful

condition at issue caused damage during the relevant periods to trigger coverage." [Filing No. 153

at 21 (citing *PSI Energy, Inc.*, 801 N.E.2d at 733-34); *see* Filing No. 158 at 2.]  Denison and Most

highlight that in Indiana Insurance's Rule 30(b)(6) corporate deposition, it admitted that property

damage occurred during at least the 2008 – 2012 policy periods.  [Filing No. 153 at 21 (citing

Filing No. 152-12 at 19-20); Filing No. 158 at 2.]  Therefore, they assert that "it is undisputed that

coverage is triggered" for those policies, and "[o]nce the primary policy limits are exhausted, the

excess policies are triggered," which results in more than enough coverage to satisfy the $8 million judgment.[11]   [Filing No. 153 at 21; *see* Filing No. 158 at 2.]

In response, Indiana Insurance argues that Denison's citation to Indiana Insurance's corporate deposition is "incomplete," highlighting that the 30(b)(6) designee also testified that property damage took place through all of the Harleysville Policies.   [Filing No. 166 at 10.] Indiana Insurance also asserts that its 30(b)(6) designee's opinion "has limited value" because the designee "is an adjuster and not a forensic engineer."   [Filing No. 166 at 10-11.]   It further highlights evidence from experts who opine that they cannot determine when the property damage occurred.   [Filing No. 166 at 11-12.]   Indiana Insurance reiterates that the "injury-in-fact" approach does not apply here, but rather the "multiple trigger" approach.   [Filing No. 166 at 12-14.]   It argues that, under the "multiple trigger" approach, the Court must find that "coverage is triggered from the time the repairs were first undertaken in 1992 until the property damage manifested itself in 2016," and that the Court must apply a pro-rata allocation of the $8 million judgment across all of those years.   [Filing No. 166 at 14-16.]

In reply, Denison and Most reiterate that Indiana Insurance admitted to property damage occurring during the 2008 – 2012 Indiana Insurance Policies and argue that the Indiana Insurance's designee's qualifications are irrelevant since he was not testifying from his personal knowledge but rather testifying as Indiana Insurance itself.   [Filing No. 168 at 11; *see* Filing No. 169 at 1.] They argue that the testimony "binds Indiana Insurance and is evidence of its position on this issue."   [Filing No. 168 at 11; *see* Filing No. 169 at 1.]   Therefore, Denison and Most assert that

---

[11] In its argument on whether property damage occurred during Indiana Insurance's Policies, Denison also responds to Indiana Insurance's argument that the Known Loss Exclusion precludes coverage under the Indiana Insurance Policies for the policy year 2017-2018.   [Filing No. 153 at 22.]   This, however, is a separate issue from whether property damage occurred, and thus, the Court more appropriately addresses it in a separate section below.

they are entitled to summary judgment on the issue of whether property damage occurred during Indiana Insurance's 2008 – 2012 Policies and that Indiana Insurance is precluded from presenting arguments otherwise.  [Filing No. 168 at 12 (citation omitted); *see* Filing No. 169 at 1.]

As discussed above in Part IV.B.2., the general rule in Indiana is the "injury-in-fact" approach.  *See supra* discussion Part IV.B.2. (discussing the law and citing cases in support).  In *Eli Lilly & Co.*, 482 N.E.2d 467, the Indiana Supreme Court departed from the "injury-in-fact" approach in favor in the "multiple trigger" approach, *id.* at 471, but such a departure from Indiana's general rule is not warranted here.  At issue in that case was insurance that Eli Lilly & Company had purchased relating to the manufacturing and selling of the drug diethylstilbestrol ("DES").  *Id.* at 468.  Eli Lilly & Company had filed suit seeking a declaratory judgment against its insurers relating to products liability coverage for claims arising from DES-related illnesses.  *Id.*  "The basic dispute concern[ed] what must happen during a particular policy period to invoke insurance coverage for that period . . . ."  *Id.*  The court referenced from cases against insurers for asbestos-related illnesses, and held that, in the context of the ingestion of DES and a DES-related illness, the multiple trigger approach applies which triggered every policy between the ingestion of the medicine and the manifestation of the medicine-related illness.  *Id.* at 471.  Indiana Insurance also cites to two other cases applying the multiple trigger approach.  [Filing No. 166 at 13 (citing *Travelers Cas. & Surety Co. v. U.S. Filter Corp.*, 895 N.E.2d 1172 (Ind. 2008) (products liability case where the underlying claims involved bodily injuries allegedly caused by exposure to silica from working near the product at issue) and *Thomson, Inc. v. Ins. Co. of North Am.*, 11 N.E.3d 982 (Ind. Ct. App. 2014) (factory workers sought damages for exposure to organic solvents trichloroethylene and perchloroethylene from 1970 to 1992 which allegedly caused bodily injury in the form of cancer or increased risk of cancer)).  But Indiana Insurance does not cite to a non-

products liability or non-environmental exposure case deviating from Indiana's general rule and the Court's research has not located one.  In other words, while its clear that the multiple trigger approach is good law in Indiana in certain personal injury cases, it is not clear that it applies in the context of physical construction work like in this case.  Indiana Insurance's argument stretches the applicability of the multiple trigger approach under Indiana law and disregards the more applicable law regarding the injury-in-fact approach as the default approach.[12]  *See supra* Part IV.B.2.; *see also Dana Corp.*, 759 N.E.2d at 1060-61; *PSI Energy, Inc.*, 801 N.E.2d at 733-34.

Having established that the injury-in-fact approach applies to this case, the Court now turns to the parties' arguments regarding whether Denison and Most have established evidence from which a reasonable jury could conclude that property damage occurred during Indiana Insurance's Policies.

Federal Rule of Civil Procedure 30(b)(6) provides that:

> a party may name as the deponent a public or private corporation . . . and must describe with reasonable particularity the matters for examination.  The named organization must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. . . .  The persons designated must testify about information known or reasonably available to the organization.

Fed. R. Civ. P. 30(b)(6).  Under Rule 30(b)(6), "an entity has a duty to prepare its deponent to adequately testify not only on matters known by the deponent, but also on subjects that the entity should reasonably know." *Integra Bank Corp. v. Fidelity & Deposit Co. of Md.*, 2014 WL 109105, at *2 (S.D. Ind. Jan. 10, 2014) (quotation and citation omitted).  "The deponent's testimony reflects

---

[12] Because the multiple trigger approach does not apply here, the Court need not and does not consider Indiana Insurance's remaining arguments that under such an approach, liability is pro-rated across all Policies using the time of risk method.  [*See* Filing No. 132 at 21-23.]

the knowledge, opinions, and beliefs of the entity and not of the deponent.  This includes the

entity's interpretation of events and documents." *Id.*

      Indiana Insurance's 30(b)(6) designee provides the following testimony:

      Q:  And you said property damage had occurred during the Indiana Insurance policy
      periods also; correct?

      A:  Yes.

      Q:  Which policy periods?

      A:  At least the ones in effect until 2012.

[Filing No. 152-12 at 20.]

      This testimony serves as an admission by Indiana Insurance that property damage occurred

at least during its June 2008 – June 2012 Policies, thus satisfying that requirement of coverage.[13]

Indiana Insurance's argument that it is not an admission because its designee is merely "an adjuster

and not a forensic engineer," [Filing No. 166 at 10-11], runs counter to Rule 30(b)(6)'s purpose

that the deponent's testimony reflects testimony on the entity's behalf, not of testimony on behalf

of the individual, Fed. R. Civ. Pro. 30(b)(6); *Intergra Bank Corp.*, 2014 WL 109105, at *2,

especially where Indiana Insurance did not object in any way to its designee's answers, [*see* Filing

No. 152-12 at 20].

      The Court **DENIES IN PART** Indiana Insurance's Motion for Summary Judgment, [Filing

No. 130], to the extent it declares that the multiple trigger approach does not apply in this case.

The Court **GRANTS IN PART** Denison's Cross-Motion for Summary Judgment, [Filing No. 152],

to the extent it declares that Indiana Insurance has admitted that property damage occurred during

---

[13] This admission, however, is only a small piece of a much larger puzzle of coverage and does not lead to the conclusion that the property damage, either in part or in whole, was "caused by an 'occurrence'" such that it falls within the coverage grant.  The Policies only grant coverage if the property damage was "caused by an 'occurrence,'" which the Court turns to next, in Part IV.C.2.

its June 2008 – June 2012 Policies such that that timing requirement is met.  But as to Indiana Insurance's other policy periods, the Court notes that it is not clear that Denison and Most are seeking coverage under Indiana Insurance's Policies after June 2012 or whether they moved for summary judgment as to whether damage occurred during those later Policies.  [*See* Filing No. 153 at 21-22.]  To the extent they are seeking coverage beyond the June 2008 – June 2012 Policies and moved for summary judgment as to the timing of property damage in the later Policies, the Court **DENIES IN PART** Denison's Cross-Motion for Summary Judgment because it failed to produce evidence establishing that it is entitled to judgment as a matter of law.  It remains an issue for trial whether the timing requirement for property damage is met after June 2012.

The Court proceeds to address whether the property damage was "caused by an 'occurrence'" as required under the Policies.

### 2.    *Property Damage Caused by an "Occurrence"*

The parties dispute whether the property damage was "caused by an 'occurrence,'" defined by the Policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  *See supra* discussion Part III.B.

In support of its Motion for Summary Judgment, Indiana Insurance argues that there is no coverage because the judgment in the Underlying Action is not for property damage caused by an "occurrence" within the meaning of the Policies.  [Filing No. 132 at 19-21.]  It relies primarily on *Tri-Etch v. Cincinnati Insurance Co.*, 909 N.E.2d 997 (Ind. 2009) and its language that "occurrences" ordinarily do not include contractual obligations.  [Filing No. 132 at 20.]  It asserts that *Tri-Etch* establishes that a CGL policy does not guarantee the quality of services provided, but instead insures against accidents that arise out of a business like a slip and fall.  [Filing No. 132 at 20-21.]

In its response and Cross-Motion, Denison (and Most by its Joinder) argue that Indiana Insurance's argument goes against the CGL Policy language and well-settled Indiana law.  [Filing No. 153 at 15; Filing No. 155 at 3.]  They argue that the CGL Policy language does not distinguish between "occurrences" caused by breach of contract and "occurrences" caused by negligence. [Filing No. 153 at 15; Filing No. 155 at 3.]  Denison and Most contend that a different Indiana Supreme Court case, *Sheehan Construction Co., Inc. v. Continental Casualty Co.*, 935 N.E.2d 160 (Ind. 2010), controls here, not *Tri-Etch*, and that Indiana Insurance admitted that Most performed faulty work which was the cause of the damage.  [Filing No. 153 at 17-18 (citing to Filing No. 152-12 at 29-30); Filing No. 155 at 3.]  They argue further that Indiana Insurance's reliance on *Tri-Etch* is misplaced both because "it is not clear that *Tri-Etch* remains good law after *Sheehan*," and even if *Tri-Etch* does not conflict with *Sheehan*, it only controls "in the context of professional services and not physical work that causes property damage, [like] in *Sheehan* and this case." [Filing No. 153 at 18-19; *see* Filing No. 155 at 3.]  Lastly, Denison and Most assert that, "to the extent there is any ambiguity about whether the definition of "occurrence" applies to Most's work at issue, that ambiguity must be construed in favor of coverage under Indiana law."  [Filing No. 153 at 21; *see* Filing No. 155 at 3.]

Indiana Insurance, in its reply, reiterates the argument that *Tri-Etch* controls and that they have no duty to indemnify Most for its breach of contract judgment.  [Filing No. 166 at 6-10.]  It argues that Denison's and Most's argument that *Tri-Etch* is no longer good law in light of *Sheehan* is "wholly without merit," noting that the same five Justices decided both cases just a year apart and even cited *Tri-Etch* favorably in *Sheehan* for the definition of "accident."  [Filing No. 166 at 6.]  It asserts that *Tri-Etch* is not limited to professional services.  [Filing No. 166 at 9.]

In their replies, Denison and Most reiterate their argument that the judgment in the Underlying Action was for property damage caused by Most's physical damage to steel tendons, tendon sheathing, and surrounding concrete, not by Most's professional advice on when and where to make repairs, so *Sheehan*, not *Tri-Etch*, controls.  [Filing No. 168 at 3-5; *see* Filing No. 169 at 2.]

The CGL Policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  *See supra* discussion Part III.B. The CGL Policies do not define "accident," but the Indiana Supreme Court "has defined accident to mean 'an unexpected happening without an intention or design.'"  *See supra* discussion Part III.B.; *Sheehan Const. Co., Inc. v. Cont'l Cas. Co.*, 935 N.E.2d 160, 170 (Ind. 2010) (quoting *Tri-Etch, Inc. v. Cincinnati Ins. Co.*, 909 N.E.2d 997, 1002 (Ind. 2009)).  "Implicit in the meaning of 'accident' is the lack of intentionality."  *Sheehan*, 935 N.E.2d at 170 (citing *Tri-Etch*, 909 N.E.2d at 1002).  Whether an event is covered as an "occurrence" under identical or similar definitions in CGL policies has frequently been addressed by Indiana courts.  *See Sheehan*, 935 N.E.2d at 167; *Tri-Etch*, 909 N.E.2d at 1001-02.

As the parties have identified, the Court's resolution of whether the judgment in the Underlying Action is for property damage caused by an "occurrence" such that the judgment is covered by the initial grant of coverage is guided by two Indiana Supreme Court decisions decided a year apart: *Tri-Etch, Inc. v. Cincinnati Insurance Co.*, 909 N.E.2d 997 (Ind. 2009) and *Sheehan Construction Co., Inc. v. Continental Casualty Co.*, 935 N.E.2d 160 (Ind. 2010).  The Insurers stress the principles addressed in *Tri-Etch*, while Denison and Most argue that *Sheehan* is analogous and supports their coverage contentions.

In *Tri-Etch*, the Indiana Supreme Court construed the term "occurrence," defined as an "accident," (using the same language as the CGL Policies at issue) and applied it to a claim of injury arising from a business's negligence in the performance of its services. *Tri-Etch*, 909 N.E.2d at 1001-03. The insured defendant, Tri-Etch, provided alarm security services to a liquor store business. *Id.* at 999. Its services included monitoring the liquor store's night alarm, ensuring that it had been set after the store closed at midnight, and notifying the store manager within 30 minutes if the alarm had not been set at midnight. *Id.* One night, Tri-Etch waited until 3:00 a.m. (instead of 12:30 a.m.) to notify the store manager that the alarm had not been set at midnight. *Id.* The store's manager went to the store and found that the employee who had been working the closing shift and the store's money were missing. *Id.* The employee was found at 6:00 a.m., beaten and tied to a tree in a local park. *Id.* The employee died later that day from his injuries, and his family sued Tri-Etch for wrongful death, alleging that if Tri-Etch had promptly notified the manager by 12:30 a.m., the employee could have survived his injuries. *Id.* The case proceeded to trial, and a $2.5 million jury verdict was entered against Tri-Etch. *Id.*

Thereafter, the parties sought a declaratory judgment regarding whether Tri-Etch's insurer, Cincinnati Insurance Company, had a duty to indemnify Tri-Etch under the provision of its CGL policy for bodily injury caused by an "occurrence." *Id.* at 1000. Tri-Etch and the employee's estate argued that there was no intentional wrongdoing on its part and that the failure to make the 12:30 a.m. call was an "accident" and therefore an "occurrence" under the CGL policy. *Id.* at 1001-02.

The Indiana Supreme Court, however, found for Cincinnati Insurance Company and held that the $2.5 million verdict for wrongful death was not covered under the CGL policy, explaining that a business's failure to perform its services in the manner that it had promised is an "error or omission" but not an "accident," and that such a failure "is the same sort of claim as lawyer

malpractice, or an insurance agent's failure to secure coverage as the client directed." *Id.* at 1001 (citing 1 Couch on Insurance § 1:35 (3d ed. 2005)).  It noted that a "CGL policy does not guarantee the quality of work or products of its insureds," *id.* at 1001, and explained that "'occurrences' ordinarily do not include contractual obligations." *Id.* at 1003 (quoting 9 Couch on Insurance § 126:29 (3d ed. 2008)).  It held that as a matter of law, the failure to perform a service was not an "occurrence" and therefore was not covered. *Id.* at 1001-03.

Fourteen months later, the Indiana Supreme Court decided *Sheehan*.  "Broadly speaking [*Sheehan*] require[d] [the Indiana Supreme Court] to determine whether damage caused by faulty workmanship is covered under a standard CGL policy." 935 N.E.2d at 165.  Sheehan Construction Company ("Sheehan") was a general contractor for a residential subdivision who was insured under a standard CGL policy issued by Continental Casualty ("Continental"). *Id.* at 163.  Sheehan hired subcontractors to build the houses. *Id.*  One of the homeowners experienced water damage, fungus, and decay and filed a lawsuit against Sheehan alleging that the damage was the result of the faulty workmanship of Sheehan's subcontractors. *Id.*  The lawsuit eventually turned into a class action with other homeowners joining, and Continental filed a separate declaratory judgment action contending that it was not obligated to indemnify Sheehan under the language of its CGL policy. *Id.* at 164.

The Court discussed how "[t]he issue [of whether faulty workmanship is an 'occurrence' within the meaning of a standard CGL policy] has been frequently litigated in a number of jurisdictions" and "the subject of much debate . . . throughout the country." *Id.* at 165, 167.  It conducted extensive research and explained that "the jurisdictions are divided on the issue.  Some states have held that faulty workmanship or improper construction is not an 'occurrence' because it does not constitute an 'accident.'  Other states have found improper or faulty construction to be

50

an 'accident' and therefore an 'occurrence' where the resulting damage occurs without the insured's expectation or foresight." *Id.* at 167-69; *see id.* at 167 n.4; *id.* at 167-68 n.5 (citing several cases for both propositions); *id.* at 169 (citing scholarly articles for both propositions).

After noting the sides of the debate and exploring rationales, the *Sheehan* Court firmly "aligned [itself] with those jurisdictions adopting the view that improper or faulty workmanship does constitute an accident so long as the resulting damage is an event that occurs without expectation or foresight." *Id.* at 169. It explained that:

> the answer depends on the facts of the case. For example, faulty workmanship that is intentional from the viewpoint of the insured cannot be an 'accident' or an 'occurrence.' On the other hand if the faulty workmanship is 'unexpected' and 'without intention or design' and thus not foreseeable from the viewpoint of the insured, then it is an accident within the meaning of a CGL policy.

*Id.* at 170 (citation omitted).

The court also went on to discuss that its decision "is consistent with this jurisdiction's definition of 'accident' as contained in standard CGL policies." *Id.* at 171. It reiterated the contract construction principle that the pertinent provisions of insurance policies be read together as a whole and applied that principle to the CGL policy language. *Id.* at 171-72. In doing so, it highlighted the existence of an exclusion in the standard CGL policy for "your work," and asked why that exclusion would exist if the initial grant of coverage did not potentially include damage to the work of the insured or its subcontractors. *Id.* at 171. It reasoned that, if the initial grant of coverage did not contemplate that faulty workmanship could qualify as an "accident" or "occurrence," then there was no reason for the "your work" exclusion. *Id.* at 171.

The *Sheehan* Court then quickly applied the law to the facts of the case, stating that "none of the parties' [summary judgment] materials address[ed] the question of whether the faulty workmanship was the product of intentional versus unintentional conduct," and therefore

remanded for further proceedings on the issue. *Id.* at 172. And although the case dealt with faulty workmanship by a contractor's subcontractor, the court in dicta noted that "CGL policies generally do not cover contract claims arising out of the insured's defective work or product, but this is by operation of the CGL's business risk exclusions, not because a loss actionable only in contract can never be the result of an 'occurrence' within the meaning of the CGL's initial grant of coverage."[14] *Id.* at 167 (quoting *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 76 (Wis. 2004)).

To start, it is clear that *Tri-Etch* is still good law but that its holding is not as applicable in light of the *Sheehan* Court's guidance. Contrary to Denison's and Most's arguments, *Tri-Etch* is still good law because, as argued by the Insurers, *Sheehan* cites *Tri-Etch* favorably, indicating that the court was well aware of *Tri-Etch* when writing *Sheehan*. Further, *Sheehan* explicitly abrogated two Indiana Court of Appeals cases that conflicted with its holding. *See Sheehan*, 935 N.E.2d at 160-61 (abrogating *Amerisure, Inc. v. Wurster Constr. Co.*, 818 N.E.2d 998 (Ind. Ct. App. 2004) and *R.N. Thompson & Assocs., Inc. v. Monore Guar. Ins. Co.*, 686 N.E.2d 160 (Ind. Ct. App. 1997)). From this, it is clear that, had the Indiana Supreme Court intended to abrogate or overrule *Tri-Etch* via *Sheehan*, it would have clearly expressed such intent as it did for other conflicting cases.

But *Tri-Etch*, as with any case, is only good law in the realm that it occupies, which is the realm of an insured failing to render a professional service, similar to lawyer malpractice as noted by the *Tri-Etch* Court, and instructs that such a claim does not qualify as an "accident" or "occurrence" under a standard CGL policy, but is instead covered under an errors or omissions policy. *Tri-Etch*, 909 N.E.2d at 1001. By contrast, *Sheehan*'s realm is that of an insured or its

---

[14] The Court notes that the parties' summary judgment materials did not address any such exclusion in this case.

subcontractor performing faulty workmanship which causes property damage, and instructs that such a claim "depends on the facts of the case" regarding whether the faulty workmanship was "intentional from the viewpoint of the insured" (resulting in no coverage) or "unexpected" and "without intention or design" (qualifying as an "accident" and thus an "occurrence" worthy of coverage). *Sheehan*, 935 N.E.2d at 170. Thus, while *Tri-Etch* is still good law, it does not control here in light of *Sheehan*, given that this case more closely aligns with the facts of *Sheehan*. Had the Indiana Supreme Court not decided *Sheehan*, the Court may be well be inclined to find that *Tri-Etch* controls here, but that is not the case. The Indiana Supreme Court did decide *Sheehan*, and this Court must honor it and its holding that "faulty workmanship may constitute an accident and thus an occurrence" depending on "whether the faulty workmanship was the product of intentional versus unintentional conduct." *Id.* at 171-72.

But the Court notes that, for *Sheehan* to apply, the conduct supporting the underlying breach of contract judgment must have been Most's faulty workmanship and there must be proof that the faulty workmanship was performed "without intention or design." *Sheehan*, 935 N.E.2d at 172. Here, just as in *Sheehan*, the parties have not provided the Court sufficient information to answer either question. The simple verdicts in the Underlying Action do not resolve this issue, and even if the Court considers the statements by the jurors from Indiana Insurance's investigation, the statements do not help because the statements were not made by the full jury. [*See* Filing No. 152-14 at 1 ("I was able to speak with every juror, except for 6 . . . .").] Therefore, the Court cannot accept the statements as representative of the entire jury. Further, assuming that the underlying conduct was Most's faulty work, the Court notes that the parties' summary judgment materials do not address whether Most performed such work intentionally or unintentionally.

The Court is aware that its non-answer means that the case must essentially be tried again (sans Harleysville) to determine the intentionality of the conduct supporting the underlying breach of contract judgment.  Without such a determination, the Court cannot say whether *Sheehan* controls, and understandably, the case was not initially tried with such a determination in mind.

Despite the Insurers' arguments to the contrary, *Sheehan* implicates both the work of the contractor and its subcontractor, notwithstanding the facts of that case only involving the subcontractor's faulty workmanship.  The *Sheehan* Court noted that "CGL policies generally do not cover *contract claims arising out of the insured's defective work* or product, but this is by operation of the CGL's business risk exclusions, not because a loss actionable only in contract can never be the result of an 'occurrence' within the meaning of the CGL's initial grant of coverage." *Id.* at 167 (emphasis added) (quoting *Am. Girl, Inc.*, 673 N.W.2d at 76).  Despite not being central to the court's holding, the court's guidance is nonetheless an indication of the Indiana Supreme Court's view that a loss actionable in contract due to the *insured's work* may be an "occurrence" that is initially covered, save any exclusions that may later instruct otherwise.  *Id.*; *see Treat v. Tom Kelley Buick Pontiac GMC, Inc.*, 646 F.3d 487, 490 (7th Cir. 2011) ("Although this pronouncement from the court was not central to its holding in that case, it was a clear indication of the Indiana Supreme Court's view.  Our job in this case is to apply the state law as we predict the state supreme court would.") (citation omitted); *Hartzler v. Chesapeake & Ohio Ry. Co.*, 433 F.2d 104, 107 (7th Cir. 1980 ("The pronouncements in [the Indiana Supreme Court's case *Central Ind. Ry. Co. v. Anderson Banking Co.*, 247 N.E.2d 208 (Ind. 1969)], while dicta and not essential to the disposition of that case, nevertheless indicate the highest court of the state's interpretation of the law in this area, and we, sitting as another court of that state, follow that interpretation as the substantive law of Indiana.").

Further supporting the contention that *Sheehan* applies to the insured's work is the fact that some of the cases that *Sheehan* cites as being aligned with involve claims against the insured contractor for its work, not that of a sub-contractor.  *See, e.g.*, *Sheehan*, 935 N.E.2d at 168 n.5 (citing *High Country Assocs. v. New Hampshire Ins. Co.*, 648 A.2d 747 (N.H. 1994) (property damage caused by contractor's defective workmanship is an "occurrence" within the meaning of a standard CGL policy)).

Turning to Denison's and Most's argument that, "to the extent there is any ambiguity about whether the definition of "occurrence" applies to Most's work at issue, that ambiguity must be construed in favor of coverage under Indiana law," [Filing No. 153 at 21; *see* Filing No. 155 at 3], the Court finds that this argument is misguided.  While Indiana law construes ambiguous terms in a contract in favor of the insured, *Ebert*, 188 N.E.3d at 864, it is not the term here that is ambiguous—it is the facts.  There is no ambiguity about the definition of "occurrence."  The Policies define "occurrence" as an "accident," which the Indiana Supreme Court has defined as "an unexpected happening without an intention or design." *Sheehan Const. Co., Inc*, 935 N.E.2d at 170 (quoting *Tri-Etch, Inc.*, 909 N.E.2d at 1002).  Here, any ambiguity is factual, not textual.  In other words, the ambiguity revolves around what conduct supported the judgment in the Underlying Action and if the conduct was Most's faulty work, whether it was intentionally or unintentionally faulty.

The closest a party came to addressing intentionality was Denison, stating that "there is no evidence suggesting that the faulty work was intentional."  [Filing No. 153 at 17-18.]  But Denison did not support its assertion with any citations to evidence purporting to address the mindset behind Most's repairs, [*see* Filing No. 153 at 18], and therefore did not discharge its burden "to establish that the claim at issue comes within the policy's insuring provisions," *Harsco Corp.*, 199 N.E.3d

at 1219 (citing *PSI Energy, Inc.*, 801 N.E.2d at 727), nor comport with Federal Rule of Civil Procedure 56(a) requiring the identification of the evidence the party is relying upon to achieve a grant of summary judgment. *See* Fed. R. Civ. P. 56(a); *see also* *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. . . . [T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.") (quotations omitted).

In short, *Sheehan* is instructive here because the case is within its realm of affirmative physical work (not the failure to perform a professional service), but because the facts are unclear and the parties' evidentiary and legal presentations missed the essential question in *Sheehan*, the Court cannot conclude that any party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

Indiana Insurance's Motion for Summary Judgment, [Filing No. 130], is **DENIED IN PART** to the extent that it seeks a declaration that the Underlying Action is not an "occurrence" under the CGL Policies. Denison's Cross-Motion for Summary Judgment, [Filing No. 152], is **DENIED IN PART** to the extent that it seeks a declaration that the Underlying Action is an "occurrence" under the CGL Policies.

The Court clarifies that, pursuant to Indiana law, Denison/Most have the burden to establish at trial that they are entitled to coverage. Further, the Court clarifies that the Policies' grants of coverage do not cover faulty work itself, but rather only "property damage" that is

"caused" by unintentionally faulty work. *See supra* discussion Part III.B.; *see also Sheehan*, 935 N.E.2d at 166, 171-72. Thus, at trial, assuming that Most's liability is due to unintentional faulty work, Denison/Most must seek to separate damages caused by the faulty work from the faulty work itself.

### 3. *Known Claim Exclusion*

As to the last requirement in establishing an initial grant of coverage, Indiana Insurance argues in support of its Motion for Summary Judgment that, to the extent there is coverage, the Known Claim Exclusion operates to bar coverage for the Indiana Insurance policies in force after Denison's claim became known to Most in August 2016 via the letter from Denison to Most. [Filing No. 132 at 23.] It argues that the August 2016 letter put Most on notice of its allegedly defective work and requested that Most become involved in paying for repairs. [Filing No. 132 at 25.] Thus, it asserts that, under Indiana law and the language of the CGL Policies, coverage is precluded under the Indiana Insurance policies for the policy period of June 2017 - June 2018. [Filing No. 132 at 25.]

In response, Denison argues that the evidence that Indiana Insurance relies upon in support of its argument regarding notice "only mentions six damaged tendons in a single area of the Plaza Garage," which "does not constitute notice of the damage to hundreds of other tendons through the entire garage." [Filing No. 153 at 22.] It asserts that in Indiana Insurance's corporate deposition, it "admitted that it was 'certainly possible' that some of the property damage was not known to Most in the fall of 2016." [Filing No. 153 at 22.] It also contends that, in any event, the "exclusion is irrelevant because Denison is already entitled to coverage for the full $8 million and interest under the 2008 – 2012 Indiana Insurance [Policies]." [Filing No. 153 at 22.] Most incorporates Denison's argument in its response. [Filing No. 158 at 2.]

In reply, Indiana Insurance asserts that the Known Claim Exclusion is relevant because under the multiple trigger approach and pro-rata allocation, all Policies are at play, not just the June 2008 – June 2012 Policies as Denison and Most argue.[15]  [Filing No. 166 at 18.]   It also asserts that Denison's and Most's argument regarding Indiana Insurance's corporate deposition testimony is "misguided."  [Filing No. 166 at 18.]

The third requirement in the grant of coverage, known as the Known Claim Exclusion, provides:

> (3) Prior to the policy period, no insured listed under Paragraph **1.** of Section **II -** Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the . . . "property damage" occurred, then any continuation, change or resumption of such . . . "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

[*See, e.g.*, Filing No. 25-1 at 217-18; *see also supra* discussion Part III.B.]  Immediately after the above paragraph, the Policies provide two more paragraphs related to notice and timing:

> c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred . . . includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

> d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II -** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim: Reports all, or any part, of the . . . "property damage" to us or any other insurer; Receives a written or verbal demand or claim for damages because of the . . . "property damage" or [b]ecomes aware by any other means that . . . "property damage" has occurred or has begun to occur.

---

[15] As covered above, the multiple trigger approach and pro-rata allocation is not applicable in this case, and the Court need not reconsider that argument here.

[*See, e.g.*, Filing No. 25-1 at 217-18; *see also supra* discussion Part III.B.]  Despite the fact that this language is found in the coverage clause, Indiana courts refer to it as the "Known Claim Exclusion."  *Kopetsky*, 14 N.E.3d at 852-53.  Simplified, the Known Claim Exclusion stands for the proposition that if an insured has knowledge of a claim before obtaining coverage, then that knowledge bars the eventual coverage.  *See id.*; *see also Quanta Indem. Co. v. Davis Homes, LLC*, 606 F. Supp. 2d 941, 946-49 (S.D. Ind. 2009).  [*See, e.g.*, Filing No. 25-1 at 217-18.]

As applied here, if at trial Denison and/or Most attempt to obtain coverage beyond the June 2008 – June 2012 Indiana Insurance Policies, they may only attempt to assert coverage under the Policies up until June 2017.  Coverage is barred under the June 2017 – June 2018 Policy pursuant to the terms of the Policy and Indiana law because Most had received notice of loss prior to obtaining coverage.  Most's argument that Denison's August 2016 letter only notifies it of some damage is unpersuasive based both on the Policy language and the facts.

As to the Policy's language, paragraph (3) above contemplates that if a proper person had notice of property damage, then "any continuation, change or resumption of" the property damage "will be deemed to have been known prior to the policy period."  [*See, e.g.*, Filing No. 25-1 at 217-18.]  Further, paragraph (d) provides that property damage "will be deemed to have been known to have occurred at the earliest time when" a proper person becomes aware that property damage "has occurred or has begun to occur."  [*See, e.g.*, Filing No. 25-1 at 217-18.]  These provisions provide that the time that matters is when knowledge is obtained that property damage had begun to occur and any continuation or change in that property damage is irrelevant.  And as to the facts, despite Denison not knowing the full scope of damage when it wrote the August 2016 Letter to Most, all later discoveries and additional allegations connect to the descriptions in the August 2016 Letter because all allegations directly connect to faulty work.  Later amendments to the facts, if

directly connected to the initial allegations, are considered to have been known at the same time as the initial allegations.  *See Quanta Indem. Co.*, 606 F. Supp. 2d at 946-49 (analyzing under Indiana law the same policy language and finding that amended allegations of damages to the insured, when they "directly connect[ed]" to the initial allegations, were deemed known at the time of the initial allegations and therefore the insurer did not have liability under the subsequent policy period).  Therefore, even if Indiana Insurance testified that it was possible that not all the property damage was known to Most in August 2016, the result does not change.

The Court **GRANTS IN PART** Indiana Insurance's Motion for Summary Judgment, [Filing No. 130], to the extent it declares that the Known Claim Exclusion precludes coverage under the June 2017 – June 2018 Policy.

### D.    Denison's Breach of Contract Claim Against Indiana Insurance[16]

In support of its Motion for Summary Judgment, Indiana Insurance argues that Denison's breach of contract crossclaim must be dismissed.  [Filing No. 132 at 25-27.]  It argues that there is no contract between Indiana Insurance and Denison, and that under Indiana law, Denison is merely a third-party claimant to the contract between Indiana Insurance and Most (which is an insufficient legal status to assert a contract claim), as opposed to a third-party beneficiary (which is a sufficient legal status).  [Filing No. 132 at 25-27.]  It also argues that "like virtually every other American jurisdiction, Indiana follows the Direct Action Rule, prohibiting a third party or judgment creditor from directly suing a judgment debtor's insurance carrier to recover an excess judgment." [Filing No. 132 at 26 (citations omitted).]  It contends that Denison's declaratory judgment claim is

---

[16] The Court only considers Denison's breach of contract crossclaim against Indiana Insurance because the Court already dismissed Denison's breach of contract counterclaim against Harleysville.  *See supra* discussion Part IV.B.  Further, the Court notes that Most did not bring a breach of contract crossclaim against Indiana Insurance.

allowed under the "limited exception" to the Direct Action Rule, but that its breach of contract claim is prohibited.  [Filing No. 132 at 26-27 (citation omitted).]

In response, Denison argues that it can assert its breach of contract claim against Indiana Insurance and that it is entitled to an award of summary judgment on the claim.  [Filing No. 153 at 22-25.]  As for asserting the claim, it contends that as a judgment creditor, it "stands in the legal shoes of the insured, and may assert the insured's full rights under the insurance policies."  [Filing No. 153 at 23 (internal quotations omitted) (quoting *Wolverine Mut. Ins. v. Vance ex rel. Tinsley*, 325 F.3d 939, 944 (7th Cir. 2003)).]  It argues that the Policies' language supports its argument.  [Filing No. 153 at 23 (citing Filing No. 25-1 at 228).]  As for entitlement to summary judgment, it argues that it "has proven that at least Indiana Insurance has a duty to indemnify [it] for the full amount of the judgment and statutory interest," because it has proven that the Underlying Action constitutes an "occurrence" under the Policies.  [Filing No. 153 at 23.]  It also argues that the appropriate remedy for Indiana Insurance's breach of contract is payment of the $8 million judgment and prejudgment interest to Denison, not Most, and offers bankruptcy law in support of the argument.  [Filing No. 153 at 24-25.]  Most "joined" in and "incorporated" Denison's arguments.  [Filing No. 158; Filing No. 159.]

In reply, Indiana Insurance reiterates that Denison cannot bring a claim for breach of contract against it.  [Filing No. 166 at 18-19.]  It also asserts that, in any event, Denison has not established that an award of prejudgment interest would be appropriate, and to the extent that Denison seeks an award of attorneys' fees, Indiana Insurance asserts that Denison has not also not established that it would be appropriate under either the declaratory judgment action or breach of contract claim.  [Filing No. 166 at 19.]

Denison, in reply, argues that Indiana Insurance's stance on prejudgment interest is wrong.

[Filing No. 168 at 16-17.]

"Indiana follows the Direct Action Rule, prohibiting a third party or judgment creditor from directly suing a judgment debtor's insurance carrier to recover an excess judgment." *State Farm Mut. Auto. Ins. Co. v. Estep*, 873 N.E.2d 1021, 1026 (Ind. 2007) (citations omitted). As explained by the Indiana Supreme Court, "[t]he direct action rule is 'well-settled' in Indiana, subject to a limited exception." *Id.* at 1026 n.10 (quoting *City of South Bend v. Century Indem. Co.*, 821 N.E.2d 5, 10 (Ind. Ct. App. 2005)). The limited exception permits a claim by a third party who is "seeking only a declaration of the insurer's responsibilities should the allegations regarding the insured's conduct be proven." *See City of South Bend*, 821 N.E.2d at 11; *Estep*, 873 N.E.2d at 1026 n.10. Indiana law, however, does allow a third-party who qualifies as a third-party beneficiary under the contract to sue for breach of contract. *See Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006) (citing *OEC-Diasonics, Inc. v. Major*, 674 N.E.2d 1312, 1314-15 (Ind. 1996)). Thus, the resolution of this argument depends on whether Denison is a third-party beneficiary of the insurance contract between Most and Indiana Insurance.

To qualify as a third-party beneficiary

> it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. It is not enough that performance of the contract would be of benefit to the third party. It must appear that it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit, and that the other party to the agreement intended to assume the obligation thus imposed. The intent of the contracting parties to bestow rights upon a third party must affirmatively appear from the language of the instrument when properly interpreted and construed.

*Cain*, 849 N.E.2d at 514 (quoting *OEC-Diasonics, Inc.*, 674 N.E.2d at 1315). Indiana courts have found an injured third-party claimant to medical payment coverage under an insurance contract to

be a third-party beneficiary based on the following language of the policy: "We will pay medical expenses as described below" and "We will make these payments regardless of fault." *Id.* at 514 (emphases omitted).  From this language, the court found that the insurer intended to assume the obligation to pay for medical expenses to a third party who was injured on the insured's premises regardless of fault.  *Id.* at 514-15.  This makes sense because medical expenses as contemplated in a liability policy are inherently incurred by a third party.

Such language, however, does not appear in the Policies at issue, and legal debts, while owed to someone else, are self-incurred.  *See supra* discussion Part III.B. (for Policy language). From the language of the Policies at issue, it does not clearly appear that it was the intent of the contracting parties to bestow rights upon a third party.  Rather, all that can be said is that the contracting parties intended to bestow rights upon one another.  Further, Denison's citation to *Vance ex rel. Tinsley* does not help its case because the third-party claimant seeking coverage in that case filed only a declaratory judgment action, not an additional breach of contract claim, like here.  325 F.3d at 941, 944.

Because Denison is not an insured or a third-party beneficiary under the Indiana Insurance Policies, Denison cannot assert a breach of contract claim.  Indiana Insurance's Motion for Summary Judgment, [Filing No. 130], is **GRANTED IN PART** to the extent that the Court declares that Denison cannot assert its breach of contract crossclaim.  Denison's Cross-Motion for Summary Judgment, [Filing No. 152], is **DENIED** to the extent that the Court finds that it cannot assert its breach of contract claim against Indiana Insurance, and that claim is **DISMISSED**.[17]

---

[17] Because Denison's breach of contract claim is dismissed, its arguments that it is entitled to prejudgment interest and attorneys' fees based on breach of contract also fail.

**V.**
**Conclusion**

For the foregoing reasons, the Court:

- **SUSTAINS** Harleysville's objection to Denison's and Most's use of Indiana Insurance's investigator's statements related to the basis for the verdict in the Underlying Action;

- **DENIES** Most's Motion to Strike Harleysville's reliance upon certain experts;

- **GRANTS** Harleysville's Motion for Summary Judgment, [131], as it declares that Harleysville has no obligation to provide coverage under the Harleysville Policies because Denison and Most failed to establish evidence from which a reasonable jury could conclude that property damage had occurred during the Harleysville Policy periods;

- **DENIES IN PART** Denison's Cross-Motion for Summary Judgment, [152], to the extent it seeks a declaration that property damage occurred during the Harleysville Policies;

- **DISMISSES WITH PREJUDICE** Denison's counterclaim seeking a declaratory judgment that there is coverage under Harleysville Policies;

- **DISMISSES WITH PREJUDICE** Denison's and Most's breach of contract counterclaims against Harleysville;

- **DENIES IN PART** Indiana Insurance's Motion for Summary Judgment, [130], to the extent that the Court declares that the multiple trigger approach does not apply in this case;

- **GRANTS IN PART** Denison's Cross-Motion for Summary Judgment, [152], to the extent the Court declares that the requirement that property damage occur during the Policy period is met for the Indiana Insurance Policies of June 2008 – June 2012;

- **DENIES IN PART** Denison's Cross-Motion for Summary Judgment, [152], to the extent that it remains an open issue whether the requirement that property damage occur during the Policy is met for the Indiana Insurance's Policies after June 2012;

- **DENIES IN PART** Indiana Insurance's Motion for Summary Judgment, [130], to the extent the Indiana Insurance seeks a declaration that the Underlying Action is not an "occurrence" under Indiana Insurance's Policies;

64

- **DENIES IN PART** Denison's Cross-Motion for Summary Judgment, [152], to the extent that Denison and Most seek a declaration that the Underlying Action is an "occurrence" under Indiana Insurance's Policies;

- **GRANTS IN PART** Indiana Insurance's Motion for Summary Judgment, [130], to the extent the Court declares that the Known Claim Exclusion precludes coverage under the June 1, 2017 – June 1, 2018 Indiana Insurance Policies;

- **GRANTS IN PART** Indiana Insurance's Motion for Summary, [130], to the extent the Court declares that Denison cannot assert a breach of contract crossclaim;

- **DENIES IN PART** Denison's Cross-Motion for Summary Judgment, [152], to the extent that the Court finds that Denison cannot assert a breach of contract crossclaim against Indiana Insurance; and

- **DISMISSES WITH PREJUDICE** Denison's breach of contract crossclaim against Indiana Insurance.

No partial final judgment shall issue. The Court requests that the Magistrate Judge confer with the parties as soon as practicable to address the possibility of resolving the outstanding issues relating to the possibility of coverage under Indiana Insurance's Policies prior to trial.


Date: 6/24/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Distribution via ECF to all counsel of record**

65